ROBERT E. LEE SILVER MINING CO. v. OMAHA & GRANT SMELT. & REF. CO.

1. MINING CONTRACT — SALE OF ORES TO BE MINED.— A by-law of a mining company which provides that the duties of its manager "shall be to take charge of the business of selling ores mined and to look after the development of the mining property, and to attend to all of the details incident to the business of the company at its mines," delegates to the manager all the powers and duties pertain-

ing to the management of the company's affairs and business at the mines, and invests him with authority to make a valid contract, binding on the company, for the sale and delivery of all ores that shall be extracted from the mines within a period of six months from the date thereof, or within any other reasonable time, at prices and upon terms specified therein. A lease of the mines by the company to a third party, subsequently made, but prior to the expiration of the six months, will not release it from its contract obligation.

2. VALIDITY OF CONTRACT FOR ORES TO BE MINED.— A proposition in writing made to a mining company by a corporation engaged in the purchase and treatment of ores, the same being the result of prior negotiations between the parties, to purchase of the mining company all the ores which it should extract from its mines during the succeeding six months, at prices and upon terms in the proposition named, the proposition being accepted by the mining company and executed on the part of both corporations by their business managers, constititutes a valid contract, although informal and lacking the usual contract terms "buy," "sell," "pay for," etc. Nor does the fact that the mining company is not obligated to mine and furnish any given quantity of ore avoid the contract for want of mutuality, the circumstances under which it was executed being considered, and the contract showing upon its face a valid consideration.

3. THE REALTY NOT AFFECTED BY SUCH A CONTRACT.— A contract for the sale and delivery of ores after they shall be mined is a contract for the sale of chattel property, and neither incumbers nor affects the realty.

## Appeal from District Court of Lake County.

APPELLANT (defendant below) was a corporation engaged in mining and producing ores in the years 1883–84 in the county of Lake. Appellee was a corporation engaged in buying, selling, smelting and reducing ores. Appellant was a large producer of ore, and had been prior to December 1, 1883. It had been for some time disposing of most, if not all, of its ore to the appellee at agreed prices for the silver contained in the ore, deducting therefrom a charge of $18.50 per ton for treatment. At the date mentioned one E. A. Guilbault was general manager of appellant's mines, and Henry Head was manager of the business of the appellee at Leadville. Appellee being desirous of obtaining control of all the ore produced by appellant, and it

being desirous of reducing the price for the reduction and treatment of the ores, entered into negotiations, resulting on the part of appellee in. the following offer in writing, which was accepted and signed by Guilbault (manager) for appellant:

"Leadville, Colo., December 1, 1883.   Robert E. Lee Silver Mining Co., Leadville, Colo.— Dear Sir: For a period of six months from date we offer for the product of the Robert E. Lee mine as follows:

"Up to 75 ounces silver per ton, will pay 92 per cent. of New York quotations; 76 to 150 ounces silver per ton, 93½ per cent. of New York quotations; 151 to 250 ounces silver per ton, 94 per cent. of New York quotations; 251 ounces up, silver per ton, 95 per cent. of New York quotations. Deducting seventeen dollars and fifty cents ($17.50) per ton for working charges. Price of silver based on New York quotations on day of settlement.

"Yours truly, OMAHA & GRANT S. & R. Co.   By HENRY HEAD.

"R. E. LEE S. M. Co.   E. A. GUILBAULT, Manager."

After the signing of the paper of December 1, 1883, and until about the 15th of February, 1884, both parties proceeded under the terms or stipulations contained in the paper; appellant delivering all the ore produced to appellee, and it receiving it. At about the last date appellant leased its mines to one Fritz, who entered into possession, and after that time controlled and disposed of the ores produced from appellant's mines, and declined or refused to deliver them to appellee under the contract, and sold the ores to other parties.

After the expiration of the six months from December 1st appellee brought this suit against appellant to recover damages for breach of the alleged agreement. The case was tried before the court without a jury, and resulted in a judgment in favor of the plaintiff for $8,262. No question in regard to the amount of damages awarded is raised. A stipulation signed by the counsel of the respective

parties was filed in this court, containing the following: "Which amount assessed herein is hereby agreed to be correct, provided the supreme court shall be of opinion that no error in any other respect was committed by this court in the findings and rendition of judgment against the defendant."

Mr. L. S. Dixon and Mr. A. S. Weston, for appellant.

Mr. C. C. Parsons, Mr. D. C. Lyles, and Messrs. Patterson & Thomas, for appellee.

Reed, C. The counsel of appellant in his able argument relies upon two general propositions for the reversal of the judgment. They are stated by him as follows:

"*First.* That the alleged contract sued upon, under the construction claimed for it by the plaintiff, was not within the scope of the powers possessed by the witness Guilbault, as general manager of the defendant company.

"*Second.* That the instrument sued upon did not constitute a contract between the plaintiff and defendant companies for the sale and delivery to the plaintiff of all or of any particular portion of the product of the mine of the defendant for the period of time specified in it. It was not an agreement for the sale and delivery of any portion of such product, but was merely an offer or memorandum fixing the price for such portions of the product as the defendant might see fit to deliver to the plaintiff during the period of time limited. To this latter extent, but no further, can it be said to have any of the elements of a contract for sale or delivery between the parties."

In discussing the first proposition it becomes necessary to examine that portion of the by-laws of the defendant corporation providing for the appointment and defining the duties and powers of a general manager of its mines. It is as follows:

"Art. 8. There shall be a general manager of the company's mines, to be employed by the president or board of

directors, whose duties shall be to take charge of the business of selling of ores mined, and to look after the development of the mining property, and to attend to all of the details incident to the business of the company at its mines, to keep an accurate account of the receipts and disbursements of the company at the mines, and to furnish monthly statements of the same to the secretary," — which was put in evidence upon the trial. Other portions of the by-laws pertaining to the officers of the corporation, providing for their election or appointment and defining their duties and powers, were put in evidence, but are not necessarily involved or necessary to be considered in the determination of the question.

When unrestricted by the by-laws, or his duties undefined by them, a general manager of a corporation has been defined to be "the person who really has the most general control over the affairs of a corporation, and who has knowledge of all its business and property, and who can act in emergencies on his own responsibility; who may be considered the principal officer." And. Law Dict. And such is the judicial definition given in *Manufacturing Co. v. Lawson*, 57 Wis. 404, where it is also said: "The very term implies a general supervision of the affairs of a corporation in all departments." To the same point, *Spangler v. Butterfield*, 6 Colo. 356.

In the absence of restrictions or controlling usages and customs in the particular class of corporations in which he is employed, he must be considered the principal officer, to whom is delegated the entire control and management of the corporate property, as far as operating the same is concerned. Such must of necessity be the construction of his powers when the president is a non-resident, and when the president is present his duties are well defined by law, and do not necessarily extend to the practical management of the property; while directors commonly act at intervals, when called together as a body. All the other officers of a mining corporation, except the general manager, may be,

and frequently are, ignorant of the business of mining; hence the wisdom and necessity of delegating to some experienced and skilled person entire control of the property. Upon his ability and integrity, to a great extent, depends the failure or success of the enterprise. He is, as far as the administration of affairs is concerned, the chief officer, and frequently the only responsible officer, at or in the vicinity of the property, capable of binding the corporation by his contracts. In the absence of defined powers, the powers incident to the office and employment would embrace that of employing the necessary labor, opening, developing and protecting the mine, the purchasing of necessary machinery, tools and supplies, and mining and selling the ore, with power to bind the corporation for bills necessarily contracted in the prosecution of the work. It also devolves upon him to provide, either from the products of the mine, from the funds of the corporation, or some other source, money to discharge the obligations incurred in the prosecution of such work. These would be his duties and powers, and within the scope of his employment; and incident to the office, if his duties and powers were left undefined by the corporation. Other parties, in dealing with the corporation, have a right to assume, and act upon the presumption, that all the powers pertaining to the office generally are possessed by the individual in question, unless notified of restrictions and limitations.

The by-laws of a corporation are not necessarily public and known. They are for the government of the corporation. The learned counsel for appellant put in evidence some portion of the by-laws, and contends in argument that the public, in dealing with the manager, was bound by the authority conferred by the corporation, whether made public or not. The by-law of the corporation, in speaking of the manager, says: " Whose duties shall be to take charge of the business of selling of ores mined, and to look after the development of the mining property, and to attend to all of the details incident to the business of the company at

its mines," etc.   This is of necessity quite general, does not and could not contain in detail and enumerate all the powers and duties incident to the office, but the latter clause is sufficiently broad and definite to invest him with all the powers incident to the position, while it is fairly inferable from the language used — "at its mines" — that it was contemplated and understood that the other officers were not to be at the mines, and that to him were delegated all the powers and duties necessary for the conduct of the business at that locality.   These conclusions are intended to apply only to the managers of mining corporations where, as in this state, the usages, successful prosecution of mining enterprises, and the protection of parties dealing with such mining corporations, require that the powers and duties of the general manager be defined.

The learned counsel for appellant contends, in a very able and ingenious argument, that the language, " whose duty it shall be to take charge of selling ores mined," in the by-law, can only be construed to authorize the manager to sell ores after they are severed and have become chattel, and are on hand as ores, and cannot extend to the sale of ores to be produced for future delivery.   His language is: " The question presented under this by-law is whether authority to take charge of selling ores *mined* gave to the general manager any power to sell or dispose of ores *unmined*.   That it admits of none but a negative answer seems obvious."   This construction of the power and the word "mined" we think too narrow and restricted.   Nor do we think the contention that the assumption of the power by the manager for the disposition of ore not yet severed from the realty was an exercise of the power to incumber or dispose of the realty of the corporation, or in any way affect it, is tenable.   The contract was for the disposition of all the ore produced for a limited time after it became chattel in character,— after it became a product of the realty by being severed.   It was no more a contract affecting the realty than would have been the sale for future delivery of

a crop of growing grain before maturity. It disposed of no real property of the corporation, nor in any way charged or incumbered the realty, nor was there a contract for any specific quantity that could in any way control or influence the management of the mine. It was only a contract on the.part of the appellant to sell, and on the part of the appellee to purchase, at fixed prices, all the ore mined, taken out, etc., for six months, after the ore had been mined in the ordinary course, and made personal property.

The fact that ore before being mined and separated is a part of the realty in no way affects the character of the ore as personalty after the separation. The mining, breaking and separating the ore from the mass at once changes its legal .character, and it has no more the character of realty then wheat after it is harvested and threshed. Nor has the uncertainty of the tenure of office of the manager, and the fact that he might be at any time removed, any influence in determining the legality of the contract. All officers of a corporation hold office for a limited time, fixed in some instances; in others, determinable at the will of the corporation; yet, while filling the office, they can make contracts legally binding upon the corporation for a reasonable time. It appears from the evidence of the general manager that prior to the agreement in question the parties had extensive dealings. He said: "The Lee mine was shipping most of their ore to the plaintiff company. I presume it was shipped there for four years and more; to my knowledge, they shipped there continually from the time I came up to the 15th of February, 1884. I came to Leadville in 1883." And the reason given is the following: "We were treated better with the Omaha & Grant than we were by anybody else." With this knowledge and experience of the fairness of the dealings of the appellee, when it was found that a special contract could be made for all the output of ore for six months, with the further benefit to the company of $1 per ton in treatment, it was a duty imposed upon the manager by virtue of his office to make a contract. Another consid-

eration that might have greatly influenced the company and its manager was the fact, as shown by the evidence, that appellant was frequently in want of money in advance of its production of ore, and that appellee was able and willing to assist it by advances. It appears that, at the time of making the contract, Pennock, the president, in person, and as a consideration for its acceptance, obtained an advance of $10,000, pledging the future product of the mine for its payment, and its manager subsequently, on two or more occasions, received advances of from $2,000 to $5,000 each.

We conclude that the general manager of appellant had power and authority to bind the corporation by the contract as made. It is true that the declaration and statements of an officer of a corporation not under oath of his power and authority are not competent to establish them. But when, as in this instance, his general power and authority is conferred as in the by-law, his own testimony in regard to his powers and duties, as incidental to the general power conferred, must be regarded as conclusive, when called as a witness by the opposing party, and his testimony admitted without objection, and remaining uncontradicted by other officers of his company. He said: "I was manager of the Robert E. Lee, and am still manager, but I had the handling of the ore up to the 15th of February, 1884. I had the general management of the mine on December 1, 1883; also charge of handling and disposing of the ore. * * * I was general financial agent of the corporation. * * * I sold and disposed of all the ore that was mined and shipped from the mine. I had authority to choose the reduction works to which I would ship and to dispose of it in any way that my judgment dictated. I was placed in that position by the president of the corporation, Mr. Pennock." The following authorities support our view of the power of the manager to make a contract: Story, Ag., § 93; 1 Pars. Cont. 44; Ang. & A. Corp., §§ 297, 298; *Bates v. Iron Co.*, 7 Metc. (Mass.) 224; *Smith v. Peoria*

*Co.*, 59 Ill. 412; *Packet Co. v. Parker*, id. 23; *Fay v. Noble*, 12 Cush. 16; Green's Brice's Ultra Vires, 426, note; *Union, etc. Min. Co. v. Rocky Mt. Nat. Bank*, 1 Colo. 532, 2 Colo. 248; *McKiernan v. Lenzen*, 56 Cal. 61.

There is another view of this case which should not pass unnoticed. The general manager, Guilbault, held that office at the time of the trial, and had also been elected secretary of the corporation, and was naturally prompted to shield his company from damages, as far as he could conscientiously do so. His reluctance to testify fully is apparent. But it is fairly inferable from his entire evidence that he was not alone responsible for the contract. It appears that Mr. Pennock, the president, had been in treaty with Mr. Eddy, of the Smelting Company, in Denver, in regard to the matter, and that the contract was the result of such negotiations. He was asked, on direct examination:

" Question. About the 1st of December, 1883, did you receive any communication from the president in relation to making a contract for the treatment of ore or selling ore for six months? Answer. I had word from him by telegraph, I believe, where to ship the ore; have not got the telegram; I looked for it, but could not find it. It was a direction to ship the ore to the Omaha & Grant smelter. He stated Eddy & James. I made no agreement with the Omaha & Grant smelter with reference to the treatment of ore. The agreement was made by them. They submitted the proposition to me, and I signed it. *  *  *  I had no other purpose in signing the name of the company than to formally accept their proposition in writing. I intended to ship them the ore, and I did not take much notice of it. I signed the proposition after I received the telegram from Mr. Pennock. I think it was in pursuance of the direction I received from Mr. Pennock that I signed this proposition, and thought I was carrying out his directions."

He further said: " I made no contract to ship unproduced

ores before that time.  At the time I received the telegram from Mr. Pennock he was president of the Lee Company, and was on his way from Denver to Chicago.  I have searched for that dispatch and cannot find it.  I don't remember, but I presume that dispatch was received about the time the proposition was presented.  I have searched for it among my papers where I usually keep those things, and searched last night again diligently, and cannot find it. As near as I can remember, the telegram stated for me to ship the ore to Eddy & James, or words to that effect. Ship all ore to Eddy & James."   Again, in speaking of the contract made: "That proposition was signed by me in the office of the Omaha & Grant.  It was not prepared in my presence.  I presume it had been previously prepared.  I think I went there to make a settlement upon ores, and they got to talking of shipping the ore, and what word they had got from Pennock and Mr. Eddy.  The talk that Mr. Eddy and Mr. Pennock had had, and from what I could learn, Mr. Eddy had written to Mr. Head to make the contract.  I think Mr. Eddy had written to Mr. Head. I think that was what I learned there from the conversation with Mr. Head at the time.  Mr. Head represented that he prepared this contract in pursuance of instructions from Mr. Eddy.  I cannot make out anything else.  He showed me the contract, and I signed it.  I presume I did say something to him about receiving a dispatch from Pennock. I cannot say positively.  *  *  *  The Eddy & James Company is the same thing as the Omaha & Grant Smelting Company.  Mr. Pennock's telegram, as I remember it, simply directed me to ship the ore to the Omaha & Grant smelter.  I think that was all there was to it.  I don't remember positively receiving any letter from him (Pennock) soon after that explaining his telegram."

Although the testimony of this witness is evasive, it is fairly inferable from it that the contract originated with Messrs. Pennock and Eddy in Denver, and the execution of it was pursuant to the instructions received by the respect-

ive managers.   Mr. Head, the manager of appellee, testi-
fied: "About the 27th of November I received information
from our Denver office in regard to this contract.   In pur-
suance of that information, I submitted this proposition to
the manager of the Lee Company.   The conversation I had
with Mr. Guilbault, as manager of the Lee Company, was
to submit to him that proposition in writing, and I asked
him at the time if he had been — if he had any word from
Mr. Pennock, and, if so, if he was ready to sign the con-
tract; to which he assented, and signed it, and commenced
delivering the ore the next day.   At the time this proposi-
tion was submitted the subject was first broached by Mr.
Pennock, of the Lee Company.   It was first broached to
me by Mr. Eddy.   I was not present when the interview
took place between Pennock and Eddy, and I know noth-
ing about that, except by the communication I received at
the time."   A similar contract to the one in question had
been made and fulfilled by the same parties previously.
Mr. Head testified: "We had a contract during the preced-
ing eight or nine months.   They were not bound to deliver
the entire product of the mine to us until some time in
October, when we made a contract with them to deliver up
until the 1st of December.   It is usual for the mine owners
and the smelter owner to agree as to the price of smelting
before the ore is delivered.   That is not the invariable cus-
tom, but as a rule it is done.   Very frequently shipments
are made; that was the rule between our company and the
Lee Company.   There was an agreed price, made always
beforehand; the prices varied from time to time on differ-
ent contracts.   The last they had before this contract was
made was $18.50, eight per cent. off," etc.

By whom these contracts were made on the part of ap-
pellant does not appear, but it is fairly presumable that they
were made by the manager.   It also appears that the con-
tract in question was not materially variant from those
formerly made, except as to the length of time.   The right
to pledge or sell the ore three weeks in advance of the min-

ing would also give the right to sell for six months, or any other reasonable time. In each instance they were for ores unbroken, and for future mining and delivery. This contract was unquestioned until the appellant leased its mines and rendered itself incapable of further compliance. It is true Guilbault says Pennock, the president, repudiated the contract, but this was not until after the suit had been commenced. Guilbault's further examination shows that it was only repudiated to him, its legality never having been denied to appellee to his knowledge, and the extent of the repudiation, even to him, seems to have been as follows: " Question. In that conversation with Mr. Pennock, I will ask you if Mr. Pennock, either directly or indirectly, attempted to repudiate that contract that you had made. Answer. Yes, sir; not in the presence of Mr. Head, not with Mr. Head, I don't think. I mean not in that conversation Mr. Pennock and I had at the smelter. He said he would go and see Mr. Eddy and see if he could not cancel the suit; have it arranged so that he could cancel the suit. I do not know as Mr. Pennock denied the liability of the company in that conversation." That Guilbault's testimony remained uncontradicted by the other officers of his company, and that he retained his position as general manager, and was promoted to the secretaryship of the corporation, are circumstances to be considered in determining how the company regarded his acts in making the contract.

The second proposition relied upon, and ably supported by the elaborate argument of counsel, is " that the instrument sued upon did not constitute a contract between the plaintiff and defendant companies," etc.; and contends that the proposition was but a circular letter, amounting to no more than if it had said : "Our charges for reduction, and the prices we will pay for ores from the Robert E. Lee mine for the next six months, will be thus and so. We invite your attention to these, and solicit the continuation of your patronage." The record shows by the evidence, uncontradicted, of Guilbault and Head, that the contract was the result of

negotiations entered into by Pennock and Eddy in Denver, and executed by the respective managers at Leadville. The proposition is directed or addressed to the Robert E. Lee Silver Mining Company, Leadville, Colo.; contains a specific offer to purchase the product of the Robert E. Lee mine for six months at certain stipulated prices per ton, paying ninety-five per cent. of New York prices for the silver as quoted on the day of settlement, deducting $17.50 per ton for working charges, signed by the company by its manager, Head.   It is certainly definite and specific, and we cannot see why all that was necessary to constitute a valid contract was not contained in it when it was accepted by the mining company and appellee notified of its acceptance.  True, as urged by the eminent counsel, the proposition did not say we will " buy " and " pay for," nor did the acceptance say we will " sell; " but in transactions of this kind, words " we offer " must be deemed an equivalent to and synonymous with " we will buy; " and when the words " we offer for " are used, they must be also held to include a promise to pay. Neither in the acceptance is it necessary to say, " I sell; " an acceptance of the offer necessarily embraces the proposition.   The only word in the least ambiguous is the word " product," and that does not appear to have been misunderstood or questioned by the parties.   Up to the time appellant by its own act in leasing its property incapacitated itself from compliance with its terms, both parties regarded it as meaning what it imports,— the entire product, the output, all the ore mined and marketable.   It is insisted that the contract was void for want of mutuality, and that as appellee was not obligated to mine and furnish any given amount of ore, or in fact any ore, the contract was void.   True, there was no contract agreement to furnish any ore, but the business of appellant was mining and producing ore, and it was to be presumed that it would mine and furnish it if in the mine and accessible.  It is urged by counsel that the contract was void — *First*, that the contract was void for want of mutuality; *second*, that it was

void for want of consideration. We have already fully examined the first and cannot adopt the contention. In regard to the second, it is shown by the contract and evidence that there was the actual consideration of $1 per ton reduction in the cost of treatment of all ore to be taken out for six months, and a cash advance of $10,000 on ores to be mined and delivered in the future; either of which was sufficient consideration, though probably neither was necessary.

In *Violett v. Patton*, 5 Cranch, 150, it is said: "To constitute a consideration, it is not absolutely necessary that a benefit should accrue to the person making the promise. It is sufficient that something valuable flows from the person to whom it is made, and that the promise is the inducement to the transaction." See, also, *Townsley v. Sumrall*, 2 Pet. 182; *Hadden v. Dimick*, 31 How. Pr. 196; *Greve v. Ganger*, 36 Wis. 369; *Barton v. McLean*, 5 Hill, 256; *Thorn v. Commissioners*, 32 Beav. 490.

An almost parallel case to the one under consideration in many respects was *Riggins v. Railroad Co.*, 73 Mo. 598, growing out of the following memorandum: "Kansas City, Mo., November 6, 1872. Lead from Baxter to St. Louis at 22½ per 100. All lead shipped by Chapman & Riggins to be forwarded by M. R., F. S. & G. R. R. at above rates from January 1, 1873, to January 1, 1874, and above rates guarantied for same time. H. J. Hayden, G. F. A., Riggins & Chapman,"— the breach alleged being that the railroad company refused to transport large quantities of lead offered by plaintiff at the rates mentioned in the proposition. The same defenses were interposed that are here insisted upon in argument, and it was held that, although Riggins & Chapman did not agree to ship any lead or definite quantity, they did bind themselves to ship over the road of the company any lead they should ship to St. Louis, and that that was a sufficient consideration for the company's guaranty of rates. It was also urged in that, as in this case, the instrument was not a contract by reason of its uncer-

tainty and indefiniteness; was only an insufficient memorandum; and the court properly held: " Where parties make and sign a memorandum of agreement with the understanding that a formal contract embracing the same stipulations is thereafter to be written out and executed, if they afterwards act upon the memorandum, it will be treated as a valid and binding contract, though never written out in a formal manner." See, also, *Paige v. Woolen Co.*, 27 Vt. 485; *Kinder v. Brink*, 82 Ill. 376; *Thorn v. Commissioners, supra; Railroad Co. v. Phillipson*, 16 C. B. 2.

In this case the testimony shows that it was not intended as a memorandum upon which a contract was to be drawn, but a contract entire and complete in itself, and was so understood and acted upon by the parties to it. Guilbault testified: " I signed the name of the corporation for which I was manager, the Robert E. Lee Mining Company, by myself as manager. I presume the signature to that was an acceptance of it. I so understood it. I had no other purpose in signing the name of the company than to formally accept the proposition in writing." He also testified: "Immediately after signing this contract, the price changed to $17.50; all shipments were settled on the basis named in the contract. * * * I think they did receive about $10,000 advances on this contract, but I am not positive of it. Our books do not show it. I think we shipped mineral to the Omaha & Grant smelter about two months and a half after the execution of this contract, and the new rate fixed by the contract of $17.50 per ton; we shipped up to February 15, 1884, and all settlements were made on the basis of the price made in the agreement." Mr. Head, manager of appellee, testified, in substance, to the same, and it remains undisputed; showing conclusively that the paper signed was intended to be and was regarded as a valid existing contract, and was acted upon as such by both parties, until the mines of appellant were leased and the disposition of ore passed out of its control.

We do not think the court erred in its findings upon the law and facts, and advise that the judgment be affirmed.

RICHMOND and BISSELL, CC., concur.

PER CURIAM. For the reasons stated in the foregoing opinion the judgment of the trial court is affirmed.

*Affirmed.*

MR. JUSTICE ELLIOTT dissenting.