No. 12,134.

COHEN, ET AL., *v.* CLAYTON COAL COMPANY.

Decided September 23, 1929.

Messrs. BLOUNT, SILVERSTEIN & ROSNER, for plaintiffs in error.

Mr. ERNEST MORRIS, for defendant in error.

*In Department.*

MR. JUSTICE ALTER delivered the opinion of the court.

THIS writ is prosecuted by Morris Cohen and Jacob L. Yoches, copartners doing business as Central Coal Company, plaintiffs in error, hereinafter referred to as defendants, to review, a judgment of the district court in favor of the Clayton Coal Company, a corporation, defendant in error, hereinafter referred to as plaintiff. Upon the trial of the cause, a jury was waived, and the court, at the conclusion of the evidence and arguments, rendered judgment in favor of the plaintiff on its complaint, and in favor of the plaintiff on the cross-complaint of the defendants.

The plaintiff was engaged in the business of mining and selling lignite coal, and its product consisted of both lump and slack; the defendants were engaged in the retail coal business in the city of Denver, and prior to the time hereinafter mentioned, used in their business some of the plaintiff's product, the exact amount of which is not disclosed by the evidence. Prior to August 14, 1926, negotiations were had between the plaintiff and the defendants with reference to a continuation and expansion of their business relations, and on that date, the plaintiff wrote the defendants a letter, the pertinent parts of which are as follows:

"This agreement made and entered into this 14th day of August, 1926, whereby the Clayton Coal Company, agrees to take care of the Central Coal Company's requirements for one year from date on both lump and slack coal.

"The Clayton Coal Company agree that they will supply lump coal to the Central Coal Company from August 14th to September 30th, inclusive, 1926, at two dollars and fifty cents ($2.50) per ton, net fob mine, but after that the price will be the prevailing market price.

"Slack price to be one dollar ($1.00) per ton, fob mine, for one year from August 14, 1926, to August 14, 1927."

The defendants' only witness testified that upon the receipt of this letter, an exact copy thereof was made on the stationery of the defendants, and formally accepted by writing upon this copy the following words: "Accepted: Central Coal Co. By Morris Cohen"; that the copied letter with the notation thereon was mailed to the plaintiff; that at the same time, the defendants wrote the identical notation upon the plaintiff's original letter, and filed the same until the time of the trial, when it was produced, offered and received in evidence.

It is contended by the defendants that they accepted the proposal of the plaintiff as contained in its letter, and upon doing so, it constituted a valid, enforceable, binding and legal contract, to deliver such coal as would

be required by them in their business, for the period of a year, at the prices mentioned in the letter. This letter will hereinafter be referred to as the "contract."

The plaintiff's only witness testified that no such letter, as defendants claimed to have sent, was ever received.

The evidence discloses that after August 14, 1926, the defendants ordered both lump and slack coal from the plaintiff, and that the orders were filled at the prices mentioned in the "contract"; that no serious complaint was made by either party until some time in the month of April, 1927, when the defendants ordered slack coal, and the plaintiff refused to fill the order.

The exhibits offered by the defendants and admitted in evidence—and the facts disclosed by them are not disputed—show, that beginning in the month of December, 1926, the plaintiff had failed to furnish the required amount of slack coal to supply the defendants' "requirements," and these exhibits also disclose the fact, that as early as December, 1926, slack coal was selling on the open market, at the rate of $1.25 per ton, and before March, 1927, had been purchased by the defendants on the open market at the rate of $2.00 per ton; notwithstanding this fact, whatever coal was sold to the defendants by the plaintiff was invoiced at the price mentioned in the contract. It is admitted that in April, 1927, the plaintiff sold and delivered, and the defendant purchased and received, coal of the value of $1,911.09, and for this amount suit was brought by the plaintiff.

The defendants filed a cross-complaint, alleging that there was a valid contract, under the terms of which the plaintiff agreed to supply them their "requirements" of lump and slack coal, and failed and refused to do so, in consequence of which the defendants had been compelled to purchase slack coal on the open market at an increased price, and thereby the defendants had been damaged in the sum of $5,000, for which amount they sought judgment. The evidence also discloses that monthly ac-

274

counts, excepting for the month of April, 1927, had been promptly paid; however the exhibits show that on April 10, 1927, when the March, 1927, account was paid, there was due the defendants, by reason of plaintiff's breach of contract, the sum of $335.32, notwithstanding which, the defendants promptly paid their March, 1927, account without protest or deduction, nor did they claim a breach of the contract by the plaintiff, and seek to set off this amount against the March, 1927, account rendered them.

The court specifically found: (1) That the defendants had not formally or otherwise accepted the proposal of the plaintiff, and there was no contract between them; (2) that part performance did not constitute an acceptance; and (3) that the contract lacked mutuality.

1. There was competent evidence, which, if believed by the trial court, justified it in finding that the contract was not formally accepted, and under the well recognized rule in this jurisdiction, we are not at liberty to disturb it. *Burnett v. Myer,* 78 Colo. 352-353, 241 Pac. 726; *Johnson v. Elliott,* 76 Colo. 358-363, 231 Pac. 675.

2, 3. Defendants contend that inasmuch as a written proposal was made, and thereafter, the defendants ordered and received coal which was delivered by the plaintiff at the price mentioned in the contract, that it bound both parties to the same extent and with the same force and effect as if formally accepted.

At the trial, the court admitted in evidence several letters written by the defendants to the plaintiff respecting this contract, and all of these letters were dated subsequent to April, 22, 1927. There were also exhibits admitted showing the amount of coal which the defendants had purchased elsewhere than of the plaintiff, with the price paid therefor, and extended upon these statements was the amount which the defendants had been obliged to pay in excess of what would have been required if the coal had been furnished by the plaintiff in accordance with the contract. We are justified in assuming that the monthly accounts for all the coal sold

the defendants by the plaintiff prior to April, 1927, were promptly paid, and yet an examination of the defendants' exhibits, and about them there is no dispute, shows that beginning with the early part of December, 1926, the plaintiff had failed to furnish the defendants with sufficient slack coal for their "requirements." The record discloses that on April 10, 1927, when the March, 1927, account became due, that the defendants had purchased slack coal from other dealers at an advanced price, amounting to the sum of $335.32, notwithstanding which, the March, 1927, account was paid in full. This evidence offered by the defendants themselves, conclusively shows that the defendants were not relying on the contract to furnish their "requirements." It is also interesting to note that in the defendants' letters to the plaintiff respecting this contract, and its alleged violation by the plaintiff, at a time when slack coal was selling on the open market at about $2.00 per ton, they expressed themselves thus: "We are open to receive as much slack coal as you may desire to send us until the expiration of the contract, at the contract price," and, "but you can save yourself some damage by sending us as much slack coal as you see fit." At this time their wants were unlimited and not bound by their business "requirements."

In the case of *Lovell v. Goss*, 45 Colo. 304, 312, 101 Pac. 71, 73, 22 L. R. A. (N. S.) 1110, we quote with approval the following from the opinion in *Manhattan Life Insurance Co. of New York v. Wright*, 126 Federal 82: "The practical interpretation given to their contracts by the parties to them while they are engaged in their performance, and before any controversy has arisen concerning them, is one of the best indications of their true intent, and courts that adopt and enforce such a construction are not likely to commit serious error." This same language was approved in *Baird v. Baird*, 48 Colo. 506-518, 111 Pac. 79, and in later Colorado cases.

Our attention is directed to the case of *R. E. Lee Sil-*

*ver Mining Company v. Omaha & Grant Smelting & Refining Co.,* 16 Colo. 118, 26 Pac. 326, and it is contended that this is decisive of the case under consideration. There were two questions determined in the Lee-Omaha case supra, with one of which only are we concerned in the present case. On December 1, 1883, the representative of the Omaha company tendered to the representative of the Lee company a written proposal, in part as follows: "For a period of six months from date we offer for the product of the Robert E. Lee mine as follows:" (prices at which ore is to be received and paid) and "Deducting seventeen dollars and fifty cents ($17.50) per ton for working charges * * *." The parties previously had a written contract respecting the sale of ore mined from the Robert E. Lee property, but did not contract for the entire output, and after some negotiations, the Omaha company agreed to reduce the working charges one dollar per ton in consideration for the entire output of the mine. It will be noted that the representative of the Robert E. Lee company testified, "I signed the name of the corporation for which I was manager, the Robert E. Lee Mining Company, by myself as manager. I presume the signature to that was an acceptance of it. I so understood it. I had no other purpose in signing the name of the company than to formally accept the proposition in writing." He further testified: "Immediately after signing this contract, the price changed to $17.50; all shipments were settled on the basis named in the contract. * * * I think they did receive about $10,000 advances on this contract, but I am not positive about it. Our books do not show it. I think we shipped mineral to the Omaha & Grant smelter about two months and a half after the execution of this contract, and the new rate fixed by the contract of $17.50 per ton; we shipped up to February 15, 1884, and all settlements were made on the basis of the price made in the agreement."

"Mr. Head, manager of appellee, testified, in sub-

stance, to the same, and it remains undisputed; showing conclusively that the paper signed was intended to be, and was regarded as a valid existing contract, and was acted upon as such by both parties, until the mines of appellant were leased and the disposition of ore passed out of its control." In the Lee-Omaha case, supra, there was no question but that the Lee company accepted the proposition of the Omaha company; that the Omaha company was anxious to procure all the ore necessary to keep busy an established business, and in order to do so was willing to make a contract to treat the ores, provided it was assured of the entire output, at one dollar per ton less than the prevailing rate for that service; that in order to induce the signing of the contract, and assure the entire output, the Omaha company also advanced the Lee company the sum "of $10,000 on ores to be mined and delivered." The testimony of all of the witnesses is to the effect that the parties intended the contract should be binding upon each party thereto, and the court determined there was mutuality. The courts in upholding the contract in the Lee-Omaha case, gave the same legal force and effect to the document that the parties themselves intended at the time it was signed and delivered.

The construction placed upon this contract by the parties themselves clearly indicates that each assumed that all the coal which the plaintiff should deliver, between certain times, should be invoiced at a fixed price, and that all the coal which the defendants received should be paid for at that price. The defendants by remaining non-committal with respect to the contract, put themselves in this position: If the price of coal advances, and we see that it is advantageous for us to contend that a valid contract exists, we can do so; but if the price decreases, we will be at liberty to contend that there was no written acceptance, and that the contract was merely a price list, and for the purpose only of determining the

price of such coal as we have actually purchased and received.

In *Crane v. C. Crane & Co.*, 105 Federal 869, an action was brought to recover for goods sold and delivered. The defendants answered admitting the indebtedness, but alleged that there existed between the plaintiff and defendant a valid contract, which the plaintiff had breached, and thereby the defendants were damaged in a certain amount, for which they sought judgment in their cross-complaint. The defendant and cross-complainant contended that the contract obligated the plaintiff to furnish them all the dock timber which they should *require* for their trade in the Chicago market during a certain period of time; that plaintiffs failed to fill the orders and the defendants were compelled to purchase elsewhere at an advanced price, which was the basis of their cross-complaint.

The jury was instructed to disregard the claims of the defendants to damages, and render their verdict for the plaintiffs. The defendants sought a reversal in the Court of Appeals, Seventh Circuit.

The U. S. Court of Appeals, in a rather lengthy opinion, speaking through Circuit Judge Grosscup, says:

"It is within legal competency for one to bind himself to furnish another with such supplies as may be needed during some certain period for some certain business or manufacture; or with such commodities as the purchaser has already bound himself to furnish another. * * * Thus a foundry may purchase all the coal needed for the season; or a furnace company its requirements in the way of iron; or a hotel its necessary supply of ice. * * * So, too, a dealer in coal in any given locality may contract for such coal as he may need to fulfill his existing contracts, regardless of whether delivery by him to his customers is to be immediate or in the future. * * * In all these cases, contracts looking towards the future, and embodying subject-matter necessarily indefinite in quantity, have been upheld; but it will be observed that, al-

though the quantity under contract is not measured by any certain standard; it is capable of an approximately accurate forecast. The capacity of the furnace, the needs of the railroad, or the requirements of the hotel are, within certain limits, ascertainable by the vendor. * * * Then, too, the purchase is only an incident of the vendee's business. Presumably the business will go on irrespective of a rise or fall in the prices of subsidiary supplies. There thus remains to the vendee little or no temptation, on account of the rise or fall in prices, to greatly enlarge or diminish the quantity of his orders.

"The contracts brought to our attention have no such standard of approximate certainty, and no such safeguard against opportunity to impose upon the vendor. Plaintiffs in error were at the time engaged in no manufacture or business that required dock oak lumber as an incidental supply, nor were they under any contract to deliver such lumber to third persons at fixed prices. They were lumber merchants pure and simple—middlemen between the defendant in error, and such customers as usually come to a merchant. Should the contract under discussion be upheld, the plaintiffs in error would be held to occupy this advantageous situation: If the prices of dock oak lumber rose, they would, by that much, increase their ratio of profits, and probably, coming into a situation to outbid competitors, increase, also, the quantum of orders; if, on the other hand, prices fell below the range of profits, the orders could be wholly discontinued.

"On the contrary, the situation of the defendant in error would be this: Should prices fall, it could not compel the plaintiffs in error to give further orders; but should prices rise, the orders sent in would be compulsory, and the loss measured, both by the increase of the ratio of profits, and the probable increase of the quantum of orders. It is needless to say that such a contract is unilateral, and void for want of mutuality. It, in effect, binds the defendant in error alone, for it leaves the

plaintiffs in error—whose whole interest is embodied in the prices obtainable—in a situation to either go on, or to discontinue, as such interest develops."

It is said by the defendants that the Crane case, supra, is in conflict with the more recent decision in *Cold Blast Transportation Co. v. Kansas City Bolt and Nut Co.*, 114 Fed. 77, but we do not so view it. In the Cold Blast case supra, the Kansas City company wrote the Cold Blast company a letter in which the following language was used: * * * "We offer to deliver at your works, during six months from November 1st, 1898, the following materials at the prices stated:" then follows the prices of certain specific articles. The offer was accepted, and thereafter the Kansas City company delivered, and the Cold Blast company paid for, certain materials at the stipulated prices. Thereafter the Kansas City company refused to fill orders, and there being a balance due it for materials already sold and delivered, it brought its action to recover judgment therefor. The Cold Blast company admitted the amount for materials already sold and delivered, but in a counterclaim sought judgment in damages against the Kansas City company for breach of contract, contending that, upon the failure of the Kansas City company to fill orders for materials, it was compelled to purchase the same upon the open market at an advanced price. The Cold Blast company did not recover on its counterclaim, and sought a reversal in the U. S. Circuit Court of Appeals, Eighth Circuit. Sanborn, Circuit Judge, delivered the opinion of the Court, in which it is said:

"The main question in this case is whether or not the answer states a legal counterclaim. The basis of this counterclaim is that the plaintiff failed to deliver nuts, bolts and bars between June 1, 1899, and December 1, 1899, under the alleged renewal of the so-called contract of October 27, 1898. This supposed contract consisted of a written offer to deliver manufactured articles in unnamed quantities at certain specific prices at any time

between October 27, 1898, and June 1, 1899, and the acceptance of that offer, without more. The answer contains no averment that either the plaintiff or the defendant paid any consideration or performed any act to induce the contract, except the remitting of the offer by the plaintiff, and the sending of its acceptance by the defendant. There was therefore in the inception of this alleged agreement no consideration for the promise of either of the parties to it, except the promise of the other. Neither the letter nor the acceptance names any quantity or amount of the articles specified that is to be delivered or received under it. The plaintiff does not agree to deliver, nor does the defendant contract to receive or pay for, any quantity or amount whatever of the articles named in the writings. * * * A promise to furnish, deliver or receive specified articles at certain prices, without any agreement to order or to accept any amounts or quantities of the articles, is without binding force or effect, because neither party is thereby bound to deliver or to accept any quantity or amount whatever. Such promises are void, because they lack one of the essential elements of an agreement,—certainty in the thing to be done. Contracts for the future supply during a limited time of articles which shall be required or needed or consumed by an established business, or used in the operation of certain steamships or other machinery, are no exceptions to this principle, because they fall under the rule, "Id certum est quod certum reddi potest." * * * The line of demarcation between valid and invalid contracts here runs between the requirements of machinery, or of an established business, and the wants, desires, or requirements of the tentative vendee; and that because the former are either reasonably certain, or may be made so by evidence, while the latter are conditioned by the will of the tentative vendee alone, and are both uncertain and capable of infinite variation.

"It is, however, contended that, even if this alleged contract was void in its inception, it became valid and

binding upon the parties when the defendant ordered, and the plaintiff delivered and received payment for, a large quantity of the manufactured articles at the prices and in accordance with the terms of the letter of October 27, 1898. But the fatal defect in the alleged contract was that the plaintiff was not bound to deliver, nor the defendant to take and pay for, any specific quantity of the offered articles. As to all undelivered articles, that defect still inheres in the agreement. The plaintiff is not bound to deliver, nor the defendant to take and pay for, any articles that have not been delivered, because there is no specification in the alleged contract of the amount or quantity which the one is to deliver and the other to receive. The orders for these articles which have been filled by their delivery specified the amounts so delivered, and thus effected contracts for their sale. But these orders and deliveries have in no way remedied the fatal defect of the offer and acceptance regarding those articles which the defendant has ordered and the plaintiff has refused to deliver. The defendant never agreed to order or to pay for any quantity of these undelivered articles. If it had refused to order and take them, no action could have been maintained for its failure, because no court could have determined what amount it was required to take. Nor can an action be better maintained against the plaintiff for its failure to deliver the articles which the defendant has ordered, because the offer contains no measure of the quantity which the plaintiff was to deliver, and consequently no agreement on its part to deliver any whatever. As the contract was void in its inception, and has continued to be void as to all undelivered goods, the notice of its renewal which was delivered by the defendant was futile, since the renewal of a void contract but continues its invalidity.

"It is said that the intention of the parties was to make an agreement that the plaintiff should sell and deliver, and the defendant should buy, all the articles of

the character specified in the offer which should be needed or required by its business between October 27, 1898, and June 1, 1899; that the purpose of the construction and interpretation of contracts is to ascertain the intention of the parties; and that this contract should be interpreted to effect this intent. The answer is that while ambiguous terms and doubtful stipulations may be interpreted to carry out the intention of the parties when they fairly evidence it, their secret intention cannot be imported into contracts whose terms and meaning are plain and unambiguous, and do not express it. It is only the intention of the parties which the contract itself expresses that the courts may enforce. In the case at bar the offer of the plaintiff is nothing but a price list. The acceptance of the defendant contains no agreement to buy any of the articles specified in the list, and there is no ambiguity in the terms, or doubt in the meaning, of the writings in issue. To give effect to the intention of the parties which the defendant now alleges would be to ascribe to them a purpose, and to make and enforce for them a contract, which their writings neither express nor suggest; and this is beyond the province of the courts.'' Citing cases.

The decision in *Crane v. C. Crane Co.*, 105 Fed. 869, as applied to the instant case, furnishes us the rule that a contract between a producer who offers to furnish a retailer with sufficient coal to meet his requirements for a certain definite period of time at certain specified prices, where the contract leaves it practically within the power of the retailer to increase or decrease his requirements as the prices fluctuate above or below the contract price, is void for want of mutuality because, when the price increases, the requirements of the retailer may also increase, and when the price decreases below the contract price the requirements of the retailer will, in all probability, cease to exist. We understand that the decision in the Crane case, supra, does not announce a rule where the contract is for the future supply

of such goods as may be required, or needed or used in the *established* business of the purchaser, and where the goods thus contracted are incidental to the principal business of the purchaser.

We interpret the decision in the *Cold Blast Transportation Co. v. Kansas City Bolt and Nut Co.*, 114 Fed. 77, to be in accord with the decision in *Crane v. C. Crane & Co., supra*, and in addition, from the Cold Blast-Kansas City case, we gather the fact that when parties to a contract, such as the one under consideration in the instant case, have dealt with each other upon the terms and conditions set forth in the contract, it does not validate the contract and make it enforceable and binding between the parties, but that the contract is still void for want of mutuality, as to such articles as the one refuses to purchase, or the other refuses to sell and deliver under the terms thereof.

The defendants rely strongly on the decision announced in *Minnesota Lumber Co. v. Whitebreast Coal Co.*, 160 Ill. 85, and it is their contention that this case is decisive of the instant case. There are many distinctions between the Minnesota-Whitebreast case and the case under consideration, but we will direct attention to but a few of them. First, the parties in the Minnesota-Whitebreast case had a prepared contract submitted for signature, and both parties executed it, so there was no question as to offer and acceptance, and in the contract the Minnesota company agreed "to buy its requirements of anthracite coal for the season of 1886-1887" and "of said Whitebreast Coal Company, which is to furnish the same as ordered, * * *" and "it is agreed that this contract shall be binding on both parties." Second, the set-off alleged, and we assume that there was evidence of the same: "that at and before the making of said contracts defendant was extensively engaged in the purchase, use and sale of anthracite coal in the ordinary course of its business, and that its requirements for such coal, * * * for the season of 1886 and 1887, were a very

large amount, to wit, the amount of 50,000 tons, *all of which was well known by plaintiff."* The only question determined in the Minnesota-Whitebreast case was the question of mutuality, and the court held that under the circumstances of the case, the contract was not void for want of mutuality and that the word "requirements" as used in the contract was not ambiguous, for by the contract, one agreed to order and the other to furnish and deliver all the particular coal required in operating a certain business for a certain definite period of time, and both parties knew the amount necessary, or the same was susceptible of fairly accurate approximation. These features are wholly lacking in the instant case, and we feel that our determination herein is no wise in conflict with the Minnesota-Whitebreast case.

■ We construe a contract, such as the one under consideration, to be mutual when it contains on one hand a promise to sell, and on the other a promise to purchase, but unless it contains these elements there is want of mutuality. An examination of the contract in the instant case, discloses the want or lack of promise to purchase.

We find support in our opinion in the following cases which we have read and considered in connection with this case. *Lima, etc., Co. v. National, etc., Co.,* 155 Fed. 77, 11 L. R. A. (N. S.) 713; *Golden Cycle Mining Co. v. Rapson Coal Co.,* 188 Fed. 179; *Marx v. American Malting Co.,* 169 Fed. 582; *T. W. Jenkins & Co. v. Anaheim Sugar Co.,* 247 Fed. 958, L. R. A. 1918E, 293; *Transcontinental Pet. Co. v. Interocean Oil Co.,* 262 Fed. 278; *Memphis, etc., Mfg. Co. v. Wemyss Fur. Co.,* 2 Fed. (2d) 428; *Imperial Ref. Co. v. Kanotex Ref. Co.,* 29 Fed. (2d) 193.

We also find support in the following: 6 R. C. L. p. 686, §93, et seq; 29 R. C. L. p. 1264, §82, et seq; 35 Cyc. 56, et seq; 13 C. J. 339, et seq.

■ There was no formal acceptance of the contract, and part performance did not constitute it a valid con-

tract between the parties, and it was void for want of mutuality.

Judgment affirmed.

MR. JUSTICE ADAMS, sitting for MR. CHIEF JUSTICE WHITFORD, MR. JUSTICE CAMPBELL and MR. JUSTICE BURKE concur.