# Richmond

ESSIE MCAULEY v. MORRIS PLAN BANK OF VIRGINIA.

January 15, 1931.

Present, Prentis, C. J., and Hudgins, Epes, Gregory and Browning, JJ.

778

*Denny & Valentine*, for the plaintiff in error.

*R. Grayson Dashiell, John P. McGuire, Jr.*, and *Wirt P. Marks, Jr.*, for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

The essential facts necessary for an understanding of the contentions made and the questions of law raised by this record are these:

The plaintiff, Essie McAuley, agreed to buy an automobile from D. Major—supposed to be an automobile salesman—for $1,675. She gave Major a check for $150, drawn by her husband on State-Planters Bank and Trust Company, as an earnest of the purchase price. Major opened an account with the Richmond Trust Company by depositing the check with that bank. On the same date, which was Friday, November 18th, her husband went to the Morris Plan Bank of Virginia, the defendant, to draw $1,250 which she had there on deposit. He received from the defendant, the Morris Plan Bank, its check drawn upon the Virginia Trust Company for $1,250, payable to the order of the plaintiff. On the next day, Saturday, November 19th, the plaintiff, her husband, Major and a Mr. Darden, an automobile dealer, met at McAuley's office, and it was understood that Darden was to secure the proper title papers to the car for the plaintiff. At that time Major had with him a New York certificate of title, but did not have a Virginia certificate. The plaintiff then endorsed the $1,250 check of the defendant on the Virginia Trust Company in blank, delivered it to Darden, who in turn was to deliver it to Major when he had obtained the Virginia certificate of title. Later, on the same day, Darden brought to the plaintiff a Virginia certificate showing Major's title to the car, on the back of which was an assignment by Major to the plaintiff, duly executed and acknowledged. Then Darden delivered the $1,250 check to Major, who on the same day endorsed it in blank and deposited it in the Richmond Trust Company.

The deposit slip reads: "Deposited by D. Major, in the Richmond Trust Company, November 19, 1927. The depositor using this ticket hereby agrees that all items

payable outside of Richmond shall be forwarded by this bank at the depositor's risk; that this bank shall not be responsible for negligence, default or failure of correspondents, nor for losses in the mails; that this bank shall have the right to charge back to the depositor's account any item for which actual payment is not received; that items may be sent direct to the banks on which drawn without waiving any of the above conditions; that checks or drafts may be accepted in settlement for any collection and this bank shall not be liable except for its own negligence, until actual payment in cash is received; that items on Richmond are credited subject to actual payment through the Richmond Clearing House; and that checks on this bank not good at close of business on day deposited may be charged back to the depositor's account."

A few minutes later, certainly within half an hour, Major presented at the same counter of the Richmond Trust Company at which he had made his deposit, his own check for $1,000, drawn on that bank, which was immediately cashed, and that bank on the same date paid a check for $75, drawn on it by Major, which had been cashed by him at a hotel on the previous day. On the same date Mr. McAuley gave to Major a check for $275, drawn on the State-Planters Bank and Trust Company to Major's order, which paid the rest of the agreed purchase price of the car. Upon receipt of the certificate of title assigned to her by Major, the plaintiff called the Virginia Motor Vehicle Commissioner's office by telephone, but found it closed. On the following Monday morning, November 21st, when she presented her certificate for the purpose of having the title to the car transferred to herself, she was unable to obtain such transfer because, in the mean time, it had been discovered that the automobile had been stolen; and it is shown that the car was subsequently recovered from the plaintiff in an action brought for that purpose by its true owner.

Upon her failure to perfect her title, the plaintiff called the Morris Plan Bank on the telephone and asked if D. Major had been in to cash the $1,250 check. She was told that they had no record of its payment there, and was told to come down and see about putting in a stop-payment order. She did so, and one of the officers of defendant suggested that they go over to the Virginia Trust Company to see about it. Upon their arrival they found that the check had not been paid there, and Tyler, the assistant cashier of the defendant, put in an oral stop-payment order, to be confirmed by letter, and payment was stopped. On the same date, November 21st, the Richmond Trust Company paid a check drawn by D. Major to the order of a Richmond hotel for $35, and another drawn by him to the order of J. T. Darden for $287.50.

The State-Planters Bank and Trust Company refused to pay the $275 check of the plaintiff's husband, Edward McAuley, and when the State-Planters Bank refused payment of that check it was charged back to Major by the Richmond Trust Company, leaving to his credit a balance of $2.50. The next day, Tuesday, November 22nd, the $1,250 check was returned to the Richmond Trust Company, with a notation that payment had been refused pursuant to the stop-payment order of the defendant, Morris Plan Bank, the drawer. The president of the Richmond Trust Company immediately called the defendant on the telephone and explained that its check had been deposited with the Richmond Trust Company; that the money represented thereby had been paid out upon checks of the depositor, Major, and that the Richmond Trust Company was a holder in due course and would hold the defendant, Morris Plan Bank, responsible for the payment of the check, and insisted that the stop-payment order be withdrawn and the check at once paid.

It is a fact agreed that the Richmond Trust Company

had no notice of the fraud practiced upon the plaintiff by Major until the check for $1,250 was, on November 22nd, returned to it by the Virginia Trust Company. Thereupon, on the insistence of the Richmond Trust Company, defendant withdrew its stop-payment order and authorized payment of its check, and by letter dated November 23d, notified the plaintiff of that fact, explaining that the check had been cashed in good faith, and so it had become necessary for the Morris Plan Bank to have the stop-payment order cancelled and to authorize its payment.

This action by Mrs. McAuley against the Morris Plan Bank followed.

The defendant demurred to the evidence. The court sustained the demurrer, and entered final judgment for the defendant bank, and this the plaintiff assigns as error.

The briefs are able and comprehensive, citing many cases and discussing many questions. The relations of banks to their depositors, as to checks upon other banks, and their respective rights and duties have given rise to much litigation, and the cases have been frequently reviewed and annotated. No good purpose would be served, in our view, by attempting to repeat the discussions, which are easily accessible. *Ditch* v. *Western National Bank*, 79 Md. 192, 29 Atl. 72, 138, 23 L. R. A. 164, 47 Am. St. Rep. 389, note; *Piano Mfg. Co.* v. *Auld*, 14 S. D. 512, 86 N. W. 21, 86 Am. St. Rep. 775, note; *Garrison* v. *Union T. Co.* (Lien), 139 Mich. 392, 102 N. W. 978, 70 L. R. A. 615, 5 Ann. Cas. 813, 111 Am. St. Rep. 419, note; *Fayette Natl. Bank* v. *Summers*, 105 Va. 689, 54 S. E. 562, 7 L. R. A. (N. S.) 694, note; 47 L. R. A. (N. S.) 552, note; 6 A. L. R. 259, note.

We have illustrations in this case of the misleading habit of courts and attorneys of quoting isolated expressions from opinions about questions which were outside of the issues presented in the particular case, as well as those expressions which cannot be rightly interpreted without a

reference to the facts of the particular case then being decided.

It is frankly, repeatedly and properly conceded for the plaintiff that all of the contentions revert to the primary question whether or not the Richmond Trust Company was a holder for value without notice of any defect in Major's title; *e. g.*, "If the trust company (a) was a purchaser for value or the owner of the check, or (b) if the trust company made advances to Major on the strength of the check, and thereby acquired a specific lien thereon, or (c) if Major's interest in the check was such as to make it subject to the general or 'banker's' lien for all Major's indebtedness to the trust company, then your petitioner is entitled to recover nothing against the bank other than perhaps the small amount still held by the trust company to the credit of Major." These admissions in the original brief for the plaintiff are repeated in the reply brief thus: That "if the Richmond Trust Company became a holder for value and owner of the check, or acquired a *bona fide* lien thereon, the plaintiff has no case."

■ Before discussing that question to which alone we shall direct our attention, it may be helpful to bear in mind the general rule that where there are two equally innocent parties, one of whom must inevitably suffer loss, the loss should be borne by the party whose action was the primary cause of the loss. This is generally true, however innocent such party may be, and however hard the case may be, if the other party is without fault.

■ There is the contention for the plaintiff that the stop-payment order lulled her into a sense of security, and rendered it useless for the petitioner to take other steps to protect herself. As to this there is no intimation as to what effective steps the plaintiff could have taken to avert her loss, and it is certainly true that in any proceeding which she might have taken against any of the solvent banks,

the same ultimate question would have arisen as arises in this case, *i. e.,* whether or not the Richmond Trust Company was an innocent holder in due course for value.

■ Long before the adoption of the uniform negotiable instruments law, and before the cases we shall cite were decided, the results of the previous cases are thus summarized in the note to *Ditch* v. *Western National Bank,* 79 Md. 192, 29 Atl. 72, 138, 23 L. R. A. 164, 47 Am. St. Rep. 391: "The question as to whether the check becomes the property of the bank is really one of agreement between the parties, as we have seen above, and all the facts of the transaction must be considered. Neither an unrestricted indorsement of the paper by the customer, nor crediting him with the amount of the check on his account, with the privilege of drawing against it, is conclusive on the question of ownership. If it is, in fact, delivered to the bank for collection, or for 'collection and credit,' a credit to the customer before collection will be deemed merely provisional, which the bank may cancel if the paper is not paid: *In re State Bank,* 56 Minn. 119 [57 N. W. 336], 45 Am. St. Rep. 454. If, however, the depositor draws, or is entitled to draw, against such a deposit as cash, it works a transfer of title: *Ayers* v. *Farmers', etc., Bank,* 79 Mo. 421, 49 Am. Rep. 235. In banking transactions very little is said, but very much is understood; and in determining the legal effect of depositing checks we must apply the same rules applicable to all contracts and business affairs, and effectuate and carry out the intention of the parties to be gathered from their acts and declarations, and the accustomed and understood course of the particular business: *American Exchange National Bank* v. *Gregg,* 138 Ill. 596 [28 N. E. 839], 32 Am. St. Rep. 171. Any attempt to distinguish between a credit in the bank-book of a customer and an actual cash payment is 'as impolitic on the part of the bank' as it is 'unjust toward the individual' who accepts the credit instead of his money."

The plaintiff here seems to rely quite confidently upon the case of *Fourth National Bank* v. *Bragg*, 127 Va. 47, 102 S. E. 649, 11 A. L. R. 1034. We confess ourselves unable to find substantial support in that case for the chief contention here made, and we find much to indicate that it is unsound. For instance, we find (page 58 of 127 Va., 102 S. E. 649, 652) this construction of the syllabus and opinion in *Miller* v. *Norton*, 114 Va. 609, 77 S. E. 452: "The substance of the opinion, in so far as directly applicable to this case, is accurately stated by the reporter as follows: 'Where there is a general deposit of money in a bank, the title to and beneficial ownership of the money is vested in the bank, and the relation between it and the depositor is that of debtor and creditor. So, likewise, where a check drawn on a particular bank is presented to that bank for general deposit and the bank gives the depositor credit therefor, the relation between the bank and the depositor is that of debtor and creditor, since the giving of credit under such circumstances is practically and legally the same as if the bank had paid the money to the depositor and had received it again on deposit.

" 'Where a check on one bank is deposited in another for collection, the ownership of the check is not transferred to the receiving bank, but it is the agent of the depositor until collection is made, and not until then does it become the debtor of the depositor. But if the check is deposited in exchange for credit given the depositor, then the transaction is in effect a sale of the check to the bank, and it becomes the beneficial owner of the check and the debtor of the depositor.'

"In the course of the opinion in this case of *Miller* v. *Norton*, it is said: 'In this country, though the rule seems to be different in England, it is settled that the mere giving of credit to a depositor's account of a check does not constitute the bank a holder for value, but in order to have

that effect the credit must be drawn upon.' If this expression had to be taken at its face value, without the qualification appearing in other parts of the opinion, the facts of the instant case would fully measure up to it, because the deposit was not only checked upon but practically exhausted by the checks of the depositor. It is manifest, however, from the opinion as a whole, that the court intended to decide that wherever the credit given for the deposit carried with it the right of the depositor to draw checks thereon and the obligation of the bank to pay them, the title to the paper in exchange for which the credit was given passed to the bank. The last sentence quoted above from the syllabus is taken literally from the body of the opinion, is supported by the authorities cited therein, as well as by the great weight of authority generally, and is a correct statement of the law as we understand it to be declared in that opinion, and as we intend to declare it here."

██ Now, in the argument for the plaintiff emphasis is laid upon the contention that none of this applies to the deposit of Major in the Richmond Trust Company, because it is claimed that it did not carry the right of the depositor to draw checks and the obligation of the bank to honor them, and that unless both this right and obligation existed, the bank was not a holder in due course for value. We do not think that emphasis is correctly placed. Actions speak louder than words, and the fact that the depositor of negotiable paper is permitted to receive cash immediately following his deposit, for which cash no other consideration appears, the same result should follow as though he had been specifically given the right to check on the deposit when it was made. In this case it is conceded that had the Richmond Trust Company paid Major the $1,000 on the check when he made his deposit, and then credited him with the balance, clearly it would be a holder for value;

but it is contended that in consequence of the conditions printed on the deposit slip a different rule applies, though he was in fact given credit for the whole amount of the check and a few minutes thereafter and before the deposited check had been, or could have been, actually collected, was permitted, by his own check, to withdraw $1,000. Looking at the realities of the case, there is no substantial difference in the essential facts, and there should be none in the consequences. In either case, value passed from the Richmond Trust Company directly to Major following his endorsement in blank to the bank of the defendant's check, and as a consequence, in the absence of contrary proof, it thereby became an innocent holder for value.

The case for the plaintiff is based upon the contention that this was a mere deposit of a check for collection. Of course, different rules are properly applied where the deposit is specifically for collection and only for credit after the check has been paid by the other bank upon which it is drawn. This, however, was not a deposit merely for collection and subsequent credit. It was a deposit for immediate credit, and this the deposit slip shows. That it also shows the right of the bank to charge the check back in case it was not paid does not change it from a deposit for immediate credit into a deposit merely for collection and subsequent credit.

Conditions precisely or substantially similar have arisen in other jurisdictions, and while there may be some apparent conflict in the cases, these state the true rule:

In *Jefferson Bank* v. *Merchants Refrigerating Co.* (1911), 236 Mo. 407, 139 S. W. 545, 546, a check drawn by the defendant was endorsed in blank by the payee and deposited by him in the plaintiff bank. On the same day the payee drew checks on the plaintiff bank to an amount exceeding all of its deposits, including the check mentioned.

Before the deposited check could be presented, however, for payment, defendant stopped payment at the bank upon which the check was drawn, and the bank at which the check had been deposited sued the drawer of the check. The defendant claimed that the check had been issued by mistake and without consideration. The plaintiff was permitted to recover notwithstanding the fact that the deposit slip contained these words: "This bank in receiving out of town checks and other collections, acts only as your agent; and does not assume any responsibility beyond due diligence on its part, the same as on its own paper." We find this language in the opinion: "We are not able to see how defendant could be entitled to submit to the jury the issue of whether or not the check was indorsed to the plaintiff for collection; because the evidence is uncontroverted that plaintiff allowed the produce company to draw out the whole amount of the check so deposited, on the very day of said deposit; and this constituted the plaintiff a purchaser of said check for value. This conclusion is also sustained by the course of dealing between plaintiff and the produce company, from which it appears that on every business day between the 1st and 18th of July, 1904, the said produce company deposited checks in the plaintiff bank, and was allowed by plaintiff to check out the amounts so deposited on the very days the deposits were made. In view of this course of dealing, we are warranted in holding that the indorsement on the cover of the deposit book of the produce company, to the effect that plaintiff only received out-of-town checks subject to collection, had been waived by plaintiff bank; a right it unquestionably had. The question of whether or not a check is received for collection or is purchased outright by a banker usually arises where the indorsements on the check are of a restrictive nature; such, for instance, as where the indorsement shows that it is merely made for the purpose

of collection. However, in this case the indorsement was general, and upon the uncontroverted facts proven constituted the plaintiff a purchaser for value without notice that the check was issued without consideration.''

While the court in that case emphasizes the fact that there the notation on the deposit slip had been waived by a course of dealing, we know of no more conclusive way in which a bank could indicate a waiver of such a provision than by honoring the checks of a new depositor immediately following his deposit.

In *Old National Bank* v. *Gibson* (1919), 105 Wash. 578, 179 Pac. 117, 6 A. L. R. 247, the payee of a check deposited it to his account in the Old National Bank. The deposit slip on which he listed the check had this: "Items other than cash are received on deposit with the express understanding that they are taken for collection only." Credit for the amount was entered on the depositor's account, and he on the same day checked out his entire balance, including the credit arising from the deposit of the check in question. Payment was stopped by the maker, and the bank sued the maker. This is said: "According to the allegations of the complaint it is appellant's claim that the check was received by it in the first instance for collection only, according to the terms of the deposit slip, but, by later permitting the depositor to check out his entire account, including the amount of the check sued upon, that it thereby became a purchaser for value of such check, and entitled to maintain an action against this maker to recover the amount thereof. No rights are based upon the original deposit of the check for collection, but the contention is that the depositor, White, having been paid the full amount of his balance in reliance upon the check now in suit, then on deposit with it, the relationship of principal and agent, which had theretofore existed between the depositor, White, and the appellant bank, was terminated,

and that it did, upon making such payment, cease to hold the check for collection, and became a holder in due course under the statute. The question, then, to be determined is whether, having originally received a check as agent for collection, the bank, by honoring White's checks to an amount which entirely exhausted his balance, including the deposited check, thereby became a holder for value. * * *

"It may be frankly conceded that in this case the bank received a check for collection in the first instance, or conditionally, with the right to charge it back to the depositor's account if dishonored; and, had no advances been made on account thereof, and so long as the original relationship continued unchanged between the bank and its depositor, the former had no right in, or title to, the check which would be sufficient to constitute it a holder in due course. It may likewise be conceded for present purposes, as contended for by respondent, that the bank cannot occupy two different and inconsistent positions at the same time. But if the bank did not waive its right or privilege to charge the check back to the depositor upon its dishonor, and yet advanced its money upon the credit of the check so deposited, there is ample authority to support the view that, making such advances on the credit of the deposited check, it thereby became a holder in due course to the extent of such advances, notwithstanding that it may still have claimed the right to charge the check back to its depositor, if it saw fit. * * *

"It is, however, alleged and claimed in this case, that after the making of the deposit and the giving of the conditional credit before referred to, the bank and its depositor made a new and different contract with reference to the deposited check; that the latter, by presenting his own check and demanding the cash for his entire balance, and the bank, by accepting such check and paying the de-

positor his entire balance, in effect made a new contract, by which the bank waived the condition in the credit theretofore given, waived its right to charge back the check, if dishonored, and became the purchaser of the check for value without notice, or a holder in due course. No rule of law is perceived which prevents a bank and its depositor from changing, modifying, or making new and supplemental contracts, as often as they may agree to do so."

The court there stated that the presentation by the depositor of his check for his entire balance, including the conditional credit, established his desire and request that the existing condition in the credit be waived or modified. The court also said:

"It is immaterial in this case whether the bank relied solely upon the deposited check, or also in part relied upon the individual worth of its depositor. In either case it, by the subsequent transaction and by paying out its money upon the credit of the deposited check (no matter what other security in the form of the worth of its depositor it may have thought it had), thereby became the holder of such check in due course.

"Our negotiable instruments law, which is the uniform law common to so many States, sections 3417 and 3418, Rem. Code, provides:

" 'Where value has at any time been given for the instrument, the holder is deemed a holder for value in respect to all parties who became such prior to that time.'

"Where the holder has a lien on the instrument arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien.

"So that under the statute it is immaterial to this inquiry whether the bank, by paying its depositor's check, became the absolute owner of the check now in question, or, as some authorities seem to hold, obtained only a lien thereon to the amount of its advances. In either case,

according to the plain language of the statute, it, under the facts pleaded here, became a holder for value to the full amount for which the check was drawn. The statute above referred to expresses only what has been the law of negotiable paper since the time whereof the memory of man runneth not to the contrary."

The Washington court, in that case, expressly overruled certain cases which had been previously decided by that court not in accordance with the views there expressed. The Virginia statute, N. I. L., Code, sections 5588 and 5589, contain provisions identical with those just quoted from the Washington statute.

This expression from the annotator of that case (Note, 6 A. L. R. 259) is a correct statement of the rule deduced from many precedents, which should be applied in such cases: "A bank that gets possession of a negotiable instrument by giving the one who presents it credit for the full amount of the proceeds, and honors his checks or drafts to the same amount, or parts with some security, or in some other way makes itself liable for the amount of the deposit outside of the obligation created by the mere deposit, on the faith of the instrument, is the holder of the instrument for value." Of course, this assumes that the bank has no notice of the invalidity of the paper.

In a later case, *Raynor* v. *Scandinavian-American Bank* (1922), 122 Wash. 150, 210 Pac. 499, 502, 25 A. L. R. 721, we find this expression: "The second of the contentions is, we think, also without foundation. The condition written on the deposit slips amounted to nothing more than an agreement between the bank and each of the several depositors that, if the check deposited was not found to be good at the close of business on the day of the deposit, it could be charged back to the depositor. Such an agreement we held in *Vickers* v. *Machinery Warehouse & Sales Co.*, 111 Wash. 576, 191 Pac. 869, did not constitute a deposit

for collection, but was a sale of the paper to the bank, and passed title to the paper, subject only to the right of rescission if the paper subsequently proved to be without value. In that case we said: 'It has been argued that the fact that the Chicago bank took this draft considering that it had the right to charge the same back to the machinery company if it were not paid, shows that the bank did not become the absolute owner of the draft; that it could not maintain the dual position of being the absolute owner and at the same time reserve the right to charge back if the draft were not paid. This argument is fully answered by the Supreme Court of the United States in *Burton* v. *United States, supra* [196 U. S. 283, 49 L. Ed. 482, 25 Sup. Ct. Rep. 243], when it says: "The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of the bank when a check was not paid of charging it up against the depositor's account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the indorser of the check, and nothing more." ' "

In *Bank of Gulfport* v. *Smith* (1923), 132 Miss. 63, 95 So. 785, a check indorsed in blank was deposited with a deposit slip reading thus: "Items not payable in Gulfport are taken at depositor's risk and credited subject to actual final payment. This bank as agent for depositor will forward such items, either direct to drawee or another bank in the same city, or indirectly through correspondents in other cities." The check was drawn on an out-of-town bank, and the depositor payee "had practically no money" on deposit in the bank. On the same day the bank permitted the depositor to withdraw the entire amount of its deposit. There was no specific agreement entered into between the bank and the depositor, either at the time of the deposit or at the time of the withdrawal. Upon presentation for payment, the check was dishonored, and the

Gulfport bank sued the drawer. The plaintiff had no notice of any infirmity or defect in the check, and the court said this: "In this case, under the deposit slip, the bank originally received a check for collection under the terms as therein stated. By the issuance of this slip it did not become a holder for value. Subsequent thereto, that same day, however, it permitted this exact amount to be withdrawn by the auto company. By this act it waived the right to hold the check only for collection and became a holder for value of the check." The Mississippi court cited the two cases just referred to.

In *Bath National Bank* v. *Sonnenstrahl* (1928), 249 N. Y. 391, 164 N. E. 327, 328, there were two drafts which were drawn for the purchase price of merchandise which had been shipped to the defendant, which were deposited to the credit of the seller in the plaintiff bank, who subsequently drew checks against this credit which were paid. The bank sent the drafts to a New York bank for collection, but when presented to defendant payment was refused. The bank sued the defendant drawee, who had received the merchandise and sold it. Judgment was rendered for the defendant, plaintiff appealed and the judgment was reversed, the court, among other things, saying this: "We assume that the plaintiff received the draft merely for collection, and did not become the owner of the draft at the time the deposit was made. Plaintiff, for failure to move for the direction of a verdict, or to except to the portions of the charge in which such question of fact was submitted to the jury, is not in a position to urge now that there is no evidence to sustain the finding of the jury in that regard. The trial judge erred, however, in his refusal to charge that: 'If the Bath National Bank, after crediting the amount of the draft to the account of the Bath Produce Company, the Bath Produce Company drew on it by check, then value was passed for the bills of lading.'

That request, even if inefficiently drawn, was clearly intended and understood to mean that if the bank, though merely an agent for collection, advanced the amount of the draft to its customers before the collection was made, then it became a holder for value of such draft and the accompanying bills of lading. That proposition of law is established by an overwhelming mass of authority in this country, both judicial and extra-judicial.

"Where the depositor delivers to a bank a negotiable instrument with restrictive indorsements and the amount of the face value of the instrument is placed to the depositor's credit without · special contract that the credit is only provisional, the bank does not become a holder for value until the depositor has actually availed himself of the credit so given by drafts upon it. * * * The beneficial title of a bank receiving an instrument for collection only may be more restrictive. That we need not now decide. None the less, the bank becomes a holder for value when it makes advances upon the instrument in advance of collection. At least it may then hold the instrument as collateral security.

"So title to a draft left by a depositor with the bank for collection does not pass absolutely to the bank where the full amount of the draft was credited to the depositor, 'for convenience and in anticipation of its payment,' and 'the bank could have cancelled the credit, as it clearly accepted no· risk on the paper,' yet if the depositor 'had overdrawn, and this draft had been credited to cover the overdraft, or if the company had drawn against the draft, the bank could hold the paper until the account was squared.' It would then be a holder for value. *St. Louis and S. F. R. Company* v. *Johnston*, 133 U. S. 566, 10 S. Ct. 390, 33 L. Ed. 683."

In *Freeport Bank* v. *Viemeister* (1929), 227 App. Div., 457, 238 N. Y. Supp. 169, 171, a depositor, disregarding

the fact that a certain check, payable to his own order, but which had been delivered to him conditionally, deposited it to his own credit in the plaintiff bank. The deposit slip contained these words: "Depositors are hereby notified that credits entered in their account are conditional and not final until items deposited are paid by banks on which they are drawn." After this deposit plaintiff bank, which had previously refused certification because of insufficient funds in the depositor's account, then certified a check for the depositor. Payment was refused on the deposited check, and the bank sued the maker of the check. The court held that the certification of the check for its customer constituted a valuable consideration from the plaintiff bank, and that the restriction in the deposit slip upon the character of the credit given by the bank was for the bank's benefit; that the bank could, in good faith, waive that restriction and make the credit absolute; and that the defendant may not invoke that restriction against the bank, and insist that the original conditional character of the credit continue. It is clear, according to that decision, that the plaintiff bank had the right to waive the rule made for its own protection, with respect to the conditional character of the credit given. The conclusion based upon the uniform negotiable instruments law, which provides that the transferee receiving notice of infirmity in an instrument before it had been paid the full amount agreed to be paid therefor, is deemed a holder in due course only to the extent of the amount theretofore paid by him, was that the plaintiff bank was a holder in due course to the extent of the amount for which the bank had certified its depositor's check, and could recover judgment therefor against the maker of the deposited check.

In *Bromfield* v. *Cochran* (1929), 86 Colo. 487, 283 Pac. 45, 46, 68 A. L. R. 722, the payee of a check endorsed it

unconditionally, deposited it in his account in a bank, and the depositor was thereupon permitted to draw against the check for about one-half of its value. The affairs of the bank were being administered by a receiver, and the action was brought by the receiver, who sued the maker of the check along with the payee to recover the amount so drawn out of the bank. The deposit slip there read: "All checks, drafts and other items drawn on or payable at other banks are offered for deposit to and received by this bank as a forwarding agency * * * and will be credited provisionally subject to final cash payment, the bank reserving the right to decline payment of checks drawn against such credit." It was held that the plaintiff could recover against the drawer of the check, and the court used this language in disposing of the question (page 488 of 86 Colo., 283 Pac. 45, 46): "From the foregoing it is apparent that the sole question for determination of this court is: 'Was the Broadway Bank the owner of said check or merely an agent of the depositor for collection?' If title to the check passed to the bank, it should recover, otherwise not. We have held that where a check is drawn on one bank and unconditionally deposited in another, the latter becomes merely an agent of the depositor and title does not pass to said bank; and further that, under such circumstances, if the bank of deposit extends credit and permits the depositor to withdraw the amount of the check the bank becomes the owner thereof." The court concluded (page 490 of 86 Colo., 283 Pac. 45, 47), saying:

"Applying these principles to the instant case, we must necessarily hold that the intention of the parties is controlling; that pursuant to the provisions of the deposit slip, plaintiff bank, at the time of deposit, was merely an agent to collect; that, when it credited the amount of said check to the payee's account and thereupon paid to them $652.41 on account thereof, it thereby elected not to exercise the

right to decline payment thereof as provided by the terms of said deposit slip; and that the payment so made and the receipt thereof by the depositor evidenced an intention of the parties that a sale of said check be consummated and the bank thereby became the owner of said check.

"Our conclusions herein are fortified by all the Colorado cases hereinabove set forth. Defendants authorized circulation of their negotiable instruments in the commercial world and thereby represented that it was their valid and binding obligation to pay the amount thereof to any innocent party who held the same for value and without notice of any claimed infirmity. It would be unjust and inequitable under all the circumstances in this case to hold that the plaintiff bank, an entirely innocent party, should suffer a loss of $652.41. Certainly in all fairness, as between plaintiff bank and defendants, the loss should fall upon the defendants which caused it to exist."

In *First National Bank* v. *Corcoran* (Cal. App. 1930), 286 Pac. 1105, 1106, the payee of certain checks indorsed them in blank and deposited them to his personal checking account in the plaintiff bank. The amount of the checks were credited to his account, and he checked against his balance, reducing the amount thereof from about $3,500 to about $30 in three days. Plaintiff bank sent the checks in due course of business to the bank on which they were drawn, where payment was refused by reason of a stop-payment order of the defendant drawer of the checks. The deposit slip there read thus: "In receiving checks on deposit, this bank assumes no responsibility for the failure of any of its direct or indirect collecting agents and shall be only held liable when proceeds in actual funds or solvent credits shall have come into its possession. Under these conditions items previously credited may be charged back to the depositor's account. In making this deposit the depositor hereby assents to the foregoing conditions." The

plaintiff bank sued the maker of these checks, and it was held that it was entitled to recover. Among other things, the court said: "That the checks in question are negotiable instruments cannot be disputed. They were in writing, signed by the maker, contained an unconditional order to pay certain sums of money, were payable on demand, were payable to the order of Foley, and were drawn on the Pittsburgh Bank. (Section 3082, Civil Code [Cal.].) Neither can it be questioned that the appellant was the holder of the checks in due course. They were regular on their face; they were not overdue, and had not been previously dishonored. It had no notice of any infirmity in the instruments or defects in the title of Foley to them. It took them in good faith and for value. (Section 3133, Civil Code [Cal.].) The only ground urged by respondent to uphold the findings of the court that the checks were not taken by appellant in good faith and for value is the printed portion of the deposit slip which we have quoted. On August 16 and 17, 1927, the dates of the deposits of the two checks in question, Foley deposited about $22,000.00 with appellant. By August 19, 1927, he had checked out all this money except about $30.00. Appellant paid this money out upon Foley's written order, which is as effective, as far as consideration is concerned, as though the money were paid to him in cash. The printed portion of the deposit slip reserved the right to appellant to receive the checks for collection only, and could charge them back to the depositor in case they were not paid. This was a right which appellant might or might not exercise as it chose. In this case it did not choose to charge them back to Foley, but attempted to collect them from respondent as it had the right to do."

Other pertinent cases might be cited, but these are quite sufficient, and express the true rule applicable under the facts shown by this record.

■ For the plaintiff it is contended with earnestness that as in such cases the intention of the parties is the essential fact to be determined, and there being a demurrer to the evidence, the jury in this case might have found for the plaintiff, and that, therefore, this court should so find.

The conclusion from the premise is unsound. He who runs may read the intentions of these parties from their conduct, the end in view and the purpose accomplished. Major went into the Richmond Trust Company bank with the defendant's check for $1,250, indorsed it to the bank, intending to realize therefrom cash or its equivalent. The bank in good faith responded by supplying the desired consideration as the direct consequence of the indorsement and delivery of the defendant's check. Had the jury found in favor of the plaintiff, their verdict would have been against the evidence and without supporting evidence.

It follows that our conclusion is to affirm the judgment. That the plaintiff has been defrauded by D. Major is true, but the defendant was without fault, and she cannot impose the results of her misfortune upon the Morris Plan Bank.

*Affirmed.*