## No. 15,339.

### Powerine Company *v.* Crown Service Company.
(158 [2d] 732)

Decided April 23, 1945.

Mr. Erwin L. Regennitter, Mr. B. F. Napheys, Jr., for plaintiff in error.

Mr. FRANK H. HALL, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE BAKKE delivered the opinion of the court.

THE Powerine Company, plaintiff in error, plaintiff below, brought suit to· recover $6,673.08 "according to the account hereto annexed as Exhibit A," said exhibit being an itemized statement of account between it and the Crown Service Company, defendant in error, covering the period from March 6, 1935, to March 12, 1942. The Crown Service Company filed an answer, and counterclaim for $17,328.70 overcharges. Since the trial court felt that the matter involved a rather detailed accounting, it was referred to a referee. The referee found in favor of the Crown Service Company—but allowed the Powerine Company claim—and recommended judgment in favor of the Crown Service Company for $10,655.62, which recommendation was approved by the trial court and judgment entered accordingly. The Powerine Company seeks reversal on a writ of error.

The counterclaim of the Crown Service Company is based upon an alleged oral agreement entered into December 27, 1930, "Whereby the defendant agreed to purchase from the plaintiff the major portion of its requirements of gasoline and the plaintiff agreed to supply the defendant with its requirements of gasoline and at said time and place it was agreed by said parties that the price to be charged and paid for said gasoline would be one-fourth cent per gallon over and above the spot market price on the date of purchase, with the further agreement that the plaintiff would protect the defendant against price wars or price variations to the extent that at all times the plaintiff would furnish the defendant with gasoline at prices at least four cents per gallon less than the prevailing tank wagon price or spot

market price, whichever was lower, for gasoline of the same or similar quality in Trinidad on the day of purchase, and with the further provision that in the event the tank wagon price in Trinidad and the service station price in Trinidad should be the same, then the price to be paid by the defendant to the plaintiff for gasoline purchased should, under such conditions, be four and one-half cents per gallon less than the tank wagon price." In support of the above oral contract, there is in evidence a memorandum, Exhibit 3, which is in words and figures as follows, to wit: "Our brokerage is to be ¼ cent per gallon on all gasoline shipped charged on invoice. 4 cts. local protection below tank wagon price or the spot market price whichever is lower and should the tank wagon and service station price be the same then an additional ½ cent per gallon protection. [Signed] Fred C. Cramer." Fred C. Cramer was the president and general manager of the Powerine Company at the time this memorandum was given on December 27, 1930, but he was deceased at the time of the trial.

The Crown Service Company admitted that it had purchased and received, the respective items set forth in Exhibit A, but denied the correctness of the prices set opposite them, because they were not in accord with the terms of the oral agreement and Exhibit 3. In response to a motion to make more specific, the Powerine Company filed a statement alleging that the prices shown on Exhibit A were agreed prices, or the reasonable value of each article, or the fair value of each article. In support of its counterclaim the Crown Service Company attached Exhibits A, B, and C, showing every tank car of gasoline purchased by it from the plaintiff subsequent to December 27, 1930, and for which it was overcharged, the price at which each car was billed, the price at which it should have been billed pursuant to said agreement, together with a statement of the overcharge on each tank car.

During the trial it was "stipulated that the summaries, marked Defendant's Exhibits 4, 5, 6 and 21, are mathematically correct, and correctly show the contentions of the defendant [Crown Service Company] as to the claimed overcharges under this claimed contract [Exhibit 3] to purchase gasoline from the plaintiff. The plaintiff does not admit there was ever a contract between the parties, except Defendant's Exhibit One. And does not admit that any gasoline was purchased under any definite contract, except as shown by defendant's Exhibit One." Exhibit 1 is the original marketing agreement between the parties which the Crown Service Company contends was superseded by the oral agreement and Exhibit 3.

Under the thirty-two points specified for reversal, we note particularly the following contentions: 1. That the alleged oral contract, upon which the counterclaim is based, is void under the statute of frauds; that it is ambiguous, unintelligible and lacks mutuality. 2. That the alleged oral contract, if in force at all, was abrogated by the refusal of plaintiff in error to comply with its terms. 3. That even if valid, plaintiff in error observed the price requirements therein contained. 4. That the continuous course of conduct of both parties negatived the existence of any such oral contract as claimed by defendant in error. 5. That the lower court committed prejudicial error in matters of evidence.

1. (a) As to the alleged invalidity of the contract under the statute of frauds, i.e., section 12, chapter 71, '35 C.S.A., we believe the contract is not invalid. As previously stated, the contract was oral in part and written in part. Assuming that the memorandum—Exhibit 3—is insufficient because not signed by the Powerine Company, the party to be charged therewith (although it could probably be easily shown that Cramer as president had full authority to bind the company), nevertheless, under paragraph "Fourth" of said statute the contract is not void if "the buyer shall accept and

receive part of such goods." In this case the evidence is undisputed that the buyer, Crown Service Company, accepted all of the merchandise covered by Exhibit A. Delivery need not be contemporaneous with agreement.

■ (b) The oral contract and Exhibit 3 are not ambiguous and unintelligible when construed together. The parties had no difficulty in reaching an understanding when the Crown Service Company insisted upon the observance of the terms and conditions of the contract, and credit memorandums were issued in accordance therewith. While some of plaintiff's witnesses had difficulty in clearly stating upon what the adjustments were actually based, the trial court was justified in believing that they were made in accordance with Exhibit 3, and the stipulation entered into would indicate there would be no difficulty regarding the intentions of the parties if the contract was actually in force. The test of ambiguity or unintelligibility is not the mind of the layman, but the mind of the parties, and these men were experienced in the marketing of the products involved.

■ The fact that the contract contained no time limitation was not fatal. Under the circumstances it operated during the period of continued business relations between the parties unless terminated by either party upon reasonable notice. 13 C.J. 604, 605. There was here no notice of termination given by either party. That performance will be within a reasonable time is implied. 17 C.J.S. 370.

■ (c) This contract does not lack mutuality. Firstly, it was part and parcel of the transaction under which the Powerine Company purchased stock in the Crown Service Company, and secondly by its terms the Crown Service Company was required to buy most of its merchandise from the Powerine Company, thus distinguishing this case from that of *Cohen v. Clayton Coal Co.*, 86 Colo. 270, 281 Pac. 111; further, the claim in the Cohen case was for damages for failure to deliver. Here, Powerine Company's own account is for goods sold and

delivered under an executed contract. In the opinion in the Cohen case, is the statement: "We construe a contract, such as the one under consideration, to be mutual when it contains on one hand a promise to sell, and on the other a promise to purchase, but unless it contains these elements there is want of mutuality." These elements were present in the case at bar.

2. While there is some conflict in the evidence on the point of abrogation of the contract, the trial court found it was not abrogated; therefore, if the record discloses substantial and competent evidence to support the finding it will not be disturbed on review. There is no serious contention that the oral contract and Exhibit 3 were abrogated prior to March 6, 1935. In 1932 the Powerine Company sought to abrogate it, but the Crown Service Company refused to sign the contract tendered. So one of our problems is to determine whether there was a subsequent abrogation. On several occasions during 1935, subsequent to March 6, Mr. Walker, manager of the Crown Service Company, protested certain invoices that were not in conformity with the agreement, and corrected invoices were sent in conformity with Exhibit 3. In 1936 Walker sent a photostatic copy of Exhibit 3 to Mr. Brooks who was in charge of the accounts for the Powerine Company and as a result received credits on five cars of gasoline. On February 13, 1936, Mr. Brooks wrote Mr. Walker, inter alia, as follows: "It is our understanding of the verbal agreement that was originally made that you were to be billed on a six-cent margin for Powerine, but not on six cents on spot * * * ." There is nothing in the record to indicate that there was any oral agreement between these parties other than the one upon which counterclaim is based. As late as November 22, 1938, Mr. Brooks again wrote Mr. Walker and stated in part: "We appreciate that you are operating as the Powerine Company in Trinidad, and that we have priced you in the past on a protective basis. * * * In our opinion, it seems

the proper thing for you to do is to determine for yourself whether you prefer to operate exclusively on a jobber's contract, or whether you believe it is to your advantage to continue to operate on a protective contract as you now have." On the trial Mr. Walker was asked the question, "Now, I will ask you to state whether or not the Crown Service Company during the period December 27, 1930 to March 8, 1942, purchased any merchandise from the Powerine Company pursuant to any agreement other than this which you have just outlined [Exhibit 3]? He answered: "We never did, because we never did have any other agreement with the Powerine Company, other than that one."

As to the actual execution of Exhibit 3, even plaintiff's witnesses conceded that it was in Mr. Cramer's handwriting, and that it bore his signature.

3. We think the contention—assuming the contract to be in force—that the Powerine Company observed the price requirements thereof is answered by the stipulation above quoted, and the Powerine Company's statement filed in response to the motion to make more specific.

4. The contention that the continuous conduct of both parties negatives the existence of the oral contract is answered substantially by what we said above concerning the contract not being abrogated. In addition, counsel for the Powerine Company contends that Walker received a bill for every purchase made, within a few days after he received the merchandise, and paid most of the bills as they were received and hence the company is bound under our decision in *Johnson Oil & Refining Co. v. Elder,* 96 Colo. 314, 42 P. (2d) 610. However, the record in the present case shows that Walker was not the bookkeeper and did not find all of the discrepancies in the invoices, but that he did protest those which he did notice or had called to his attention, and on at least one occasion he made a trip to Denver to see Mr. Cramer concerning them and was told by the

latter that he would look into it. The fact, if it was a fact, that Cramer ignored this promise does not, under the circumstances, defeat the Crown Company's claim. The opinion in the Elder case, supra, is bottomed on the proposition that payments were made with full knowledge of the facts. In the instant case the trial court found and held that Walker did not have full knowledge of all the facts when the payments were made on the invoices as they came in, and there is competent evidence to support that finding. As the trial court indicated, if Walker is estopped by what he should have known, so is the Powerine Company.

█ 5. Counsel's principal objections concerning matters of evidence relate to Exhibits 7 the contract for the sale of the stock executed contemporaneously with Exhibit 3, and Exhibit 16 the letter from the Powerine Company above mentioned, relating to the protective agreement. We think both of these exhibits, after being properly identified, were admissible. The court was liberal to both sides in the matter of the admission of evidence, and we think no prejudice is shown.

As noted in the stipulation above set out, the plaintiff agrees, inter alia, that defendant's Exhibit 21 is mathematically correct. Exhibit 21 is designated as a "Summary of Summaries" and shows a total of unadjusted claims in the amount of $17,328.70. Since it is agreed that this amount is correct, if the oral agreement and Exhibit 3 are in force, there can be no question as to the correctness of the judgment, and, it appearing that the agreement was in force and binding, the judgment is affirmed.

MR. JUSTICE JACKSON did not participate.