[Civ. No. 7691. Second Appellate District, Division Two.—April 8, 1933.]

BANK OF AMERICA OF CALIFORNIA, Respondent, v. UNIVERSAL FINANCE COMPANY (a Corporation) et al., Defendants; MOE JACOBS, Executor, etc., Appellant.

Overton, Lyman & Plumb and Cecil A. Borden for Appellant.

Freston & Files and Ralph E. Lewis for Respondent.

ARCHBALD, J., *pro tem.*—Plaintiff brought suit on a check issued by defendant upon which the latter had stopped payment. From a judgment in favor of plaintiff, defendant has appealed.

There is no serious conflict in the evidence introduced, which substantially shows that Sammis-McBrien Company

was a partnership engaged in the business of selling automobiles in San Diego; that appellant, as executor of the last will and testament of Max Jacobs, doing business under the fictitious firm name and style of Universal Finance Company, was engaged in financing the purchase and sale of automobiles in Los Angeles, and on July 17, 1929, and for a period of some two years prior thereto, had purchased automobiles and delivered them to said partnership to be sold by it, and had purchased from said partnership conditional sale contracts made and entered into by and between the partnership and parties to whom it had sold such automobiles. Sammis-McBrien Company had apparently sold an automobile so placed with them by the finance company, and on the 17th of July, 1929, Mr. Sammis went to the office of the finance company with the contract, presented the partnership's check for $2,250, on respondent branch bank in San Diego, in payment of the car so sold, and in return received the finance company's check on the California Bank of Los Angeles for the same amount, in payment for the contract. This check was deposited by Sammis-McBrien Company with the respondent's San Diego branch on the same day and was credited by the bank to the account of the company. It appears that on certain contracts which the finance company had purchased from Sammis-McBrien Company no certificates of ownership issued by the motor vehicle department of the state had been received. These had been demanded by the finance company, and not yet having been furnished, Mr. Jacobs and Mr. Moss of the company went to San Diego on the night of July 17, 1929, and called on Sammis-McBrien Company the next morning, asking for an explanation. In the course of the conversation which ensued Jacobs and Moss learned that some half dozen of the contracts held by them were fictitious. The check-book of Sammis-McBrien Company was also examined and showed that the check of the finance company above referred to had been deposited; and the balance, after deducting the amount of checks drawn on the account, "indicated that when . . . our check would come through it would be an overdraft". It was then mutually agreed that "in view of the fact that this exchange of checks was purely a matter of bookkeeping, because that transaction might have been handled without any exchange of checks whatever", payment would be

stopped on both checks. In accordance with such agreement the finance company notified the California Bank to stop payment on the check it had issued, and Sammis-McBrien Company did likewise with the San Diego branch of respondent bank as to the check issued by it in favor of the finance company. On the morning of July 17, 1929, the balance of Sammis-McBrien Company in their account with respondent's branch was $2,746.97, which, together with the check of the finance company and two small items deposited with it, made a total of $5,008.97. Against this total there was drawn on the 17th of July seven items aggregating $3,827.55, leaving a balance of $1181.12 to that company's credit in said bank on the morning of July 18th. On the latter date a check for $1373.50 was charged to the account, leaving an overdraft of $192.08. It is apparent that this situation was disclosed to the representatives of the finance company on the morning of the 18th, when the check-book of the Sammis-McBrien Company was exhibited to them. The California Bank returned the check which the finance company had issued to Sammis-McBrien Company to respondent's San Diego branch after payment was stopped, and suit was eventually brought thereon by respondent.

Appellant contends that under section 16c of the Bank Act (Stats. 1925, p. 513; Deering's Gen. Laws 1931, vol. 1, p. 232) a bank as a matter of law can only act as the agent of a depositor in forwarding a check for collection in the absence of a written agreement between the parties changing such relationship of principal and agent; that no such written agreement having been shown in this case, such relationship prevailed at all times between respondent and the Sammis-McBrien Company; and the contract between the finance company and said Sammis-McBrien Company having been rescinded, respondent bank was bound thereby.

Section 16c of the Bank Act, so far as material here, reads: "Any credit allowed by any bank organized under the laws of . . . this state, for any check, . . . drawn . . . on . . . any other bank, . . . shall be only provisional, subject to final payment and to the receipt by the bank in which it is deposited of the funds in actual money, or in solvent credit on the books of any federal reserve bank, or on the books of any bank designated as a depositary by the forwarding bank; provided, . . . that when such check . . . is drawn

on . . . any other bank . . . it . . . may be forwarded for the purpose of collection directly to the bank on or by which it is drawn, or at which it is made payable, or to any federal reserve bank, or to any other bank in the usual course of business, and in payment thereof there may be accepted, either money or the check or draft of the bank on or by which it is drawn, or at which it is made payable, or the check or draft of any bank to or through which it has been forwarded for collection or credit therefor may be accepted with any federal reserve bank, or with any bank designated as a depositary by the forwarding bank.

"In forwarding for collection any check . . . or receiving payment therefor, in any manner aforesaid, the bank shall not be liable in the event of the insolvency or other default or for any act or omission, of any bank employed directly or indirectly in handling the collection of such check, note or other instrument, or of any bank on or by which the draft received in payment is drawn; nor for the payment of any check or draft, or credit as may have been accepted in payment therefor; nor for the loss or destruction of, or inability to repossess itself of any check, note or other instrument in transit or in the possession of others. Until the proceeds of any check, note or other instrument providing for the payment of money shall have been actually received by the bank allowing such credit, in actual money, or in solvent credit on the books of any federal reserve bank, or on the books of any bank designated as a depositary by the forwarding bank, such check, note or other instrument may be charged back to, or collected from, the depositor from whom it was received regardless of whether or not the check, note or other instrument itself can be returned. . . . Any provision of this section may be modified or set aside by an agreement in writing between any such bank and any party from whom any check, note or other instrument is received for collection, deposit or other purpose."

Prior to the adoption of the section above quoted from, the rule in California had been for many years, at least, that upon the deposit of a check by a customer in the ordinary course of business of the bank the title to the check vested in the bank, creating the relationship of debtor and creditor, upon the implied contract on the part of the customer, however, to repay the amount of the instrument

to the bank in case it was returned to the latter unpaid. (*Plumas County Bank* v. *Bank of Rideout*, 165 Cal. 126 [131 Pac. 360, 47 L. R. A. (N. S.) 552].) The difficulties banks of deposit were caused by this rule apparently led to the adoption and use of a form of deposit slip or pass-book in which it was stated in effect that the acceptance and credit of such a check was for the purpose of collection only and that the bank was not liable until the collection was made. The record in the case of *National Bank of California* v. *Miner*, 167 Cal. 532 [140 Pac. 27], sets out the lengthy agreement printed in its pass-books by the plaintiff in such case, which changed the relation existing under the laws of California between the bank and the general depositor to that of principal and agent, and which provided, in addition, that the bank of deposit should not be liable for the default of any bank, person or subagent used in making such collection, or for loss in transit, or "until the proceeds in actual money shall come into its possession". That some of the banks were still using the old deposit slips with a similar agreement after the adoption of section 16c is shown by the record in the case of *Merced Security Sav. Bank* v. *Bent Bros.*, 207 Cal. 652 [279 Pac. 765], in which a deposit slip of one of the banks involved contained substantially identical terms. In 1924 the case of *Luckehe* v. *First Nat. Bank of Marysville*, 193 Cal. 184 [223 Pac. 547], laid down the rule that an agent authorized merely to collect a demand cannot bind his principal short of actual collection and receipt of the money. In such case a certificate of deposit issued by the First National Bank of Gridley was delivered to the plaintiff in the case, who indorsed it to the Marysville Bank and in exchange received an interest-bearing certificate of deposit in his name. The Marysville Bank sent the certificate of deposit received by it to its correspondent, the Rideout Bank in Gridley, for collection, which bank presented it to the bank of issuance at Gridley the afternoon of the day it was received. Instead of demanding cash in exchange for it the Rideout Bank accepted from the First National Bank of Gridley a draft on the Anglo & London-Paris National Bank of San Francisco, which it mailed to the Marysville Bank, which in turn indorsed and mailed it to its San Francisco correspondent, by whom it was presented to the Anglo

& London-Paris National Bank, when it was dishonored. The draft was returned to the Marysville Bank, which notified plaintiff of its rejection. On the same day the First National Bank of Gridley closed its doors. Plaintiff demanded payment of the certificate of deposit issued him by the Marysville Bank, and upon refusal thereof brought suit, with the result that judgment went for the defendant bank in the trial court, which was reversed by the Supreme Court in an opinion declaring the rule of law first stated. That case involved the relationship of principal and agent, as the parties all agreed that the certificate of deposit was taken for the purpose of collection only, and impressed the banks with a new danger to them in making collections in the usual course of banking business as generally conducted.

Another case of interest to banks was handed down by the Supreme Court of the United States in the same year, viz., *Federal Reserve Bank of Richmond* v. *Malloy*, 264 U. S. 160 [44 Sup. Ct. 296, 68 L. Ed. 617, 31 A. L. R. 1261]. The state of Florida adopted a law in 1909 providing that when any check, draft or other negotiable instrument is deposited in a bank for credit it shall be considered due diligence on the part of the bank in the collection thereof to forward same without delay in the regular course of business, and that the maker, indorser, guarantor or surety of any such instrument ''shall be liable to the bank until actual final payment is received''. The check in question in the case cited was for the sum of $9,000, drawn upon the Bank of Lumber Bridge, North Carolina. It was sent on in the usual course of collection by the bank of deposit, the Perry Banking Company, of Perry, Florida, and reached the Federal Reserve Bank at Richmond, which in turn forwarded it direct to the Lumber Bridge Bank for payment, receiving a draft therefor on a bank in Greensboro, North Carolina, which bank in turn notified the Richmond bank by wire that the Lumber Bridge Bank did not have sufficient funds on deposit to pay it. The Richmond bank again took up the matter of payment with the Lumber Bridge Bank, which promised payment but did not make good. The Supreme Court held that the Richmond bank was liable to the depositor of the check, although a collecting agent, for accepting the worthless draft instead of the cash, notwithstanding a regulation of the Federal Reserve Bank which

authorized sending a check for collection direct to the drawee bank.

There can be little doubt that the two cases referred to called the attention of bankers in California to another serious danger, with the result that section 16c of the Bank Act was adopted, which not only enacted into law the relationship created by the agreements banks had theretofore printed, but carried the protection still further to authorize the acceptance by the collecting banks of checks or drafts, as well as money, the sending of the instruments deposited direct to the bank on which they were drawn, and absolved the bank of deposit from liability ''in event of insolvency or other default or for any act or omission'' of any other bank employed in the collection thereof, or for the loss or destruction of the instrument. ■ To protect the bank from the uncertainty of parol testimony which might show the relationship of debtor and creditor or some other change in the liability of the bank, the section provides that any provision of the section may be modified by an agreement in writing between the bank and the party from whom the instrument is received for collection. We fail to see anything in section 16c or in the history leading up to its adoption which makes the last-mentioned provision a declaration of public policy, as urged by appellant, requiring us to hold that the provisions of the section can only be changed by an agreement in writing. We observe no reason why the written checks drawn by the Sammis-McBrien Company on the account containing the deposit of the check issued by appellant (at a time when there was an insufficient balance in said bank to pay the same without giving credit for such check), together with the circumstance of the acceptance of the checks by the bank and payment thereof, does not constitute as high an order of evidence as any ''agreement in writing'' between the parties could possibly be, and it might well be treated as such an agreement, changing the relationship from that of principal and agent to that of debtor and creditor. Prior to the adoption of section 16c it was customary among banks to change the relationship of principal and agent, resting in agreement, by the acceptance of checks drawn on a provisional deposit, to that of debtor and creditor, the bank then becoming the owner and holder of the check so provisionally deposited.

(See *Bromfield* v. *Cochran*, 86 Colo. 486 [283 Pac. 45, 68 A. L. R. 722]; *Old National Bank of Spokane* v. *Gibson*, 105 Wash. 578 [179 Pac. 117, 6 A. L. R. 247]; *Jefferson Bank* v. *Merchants Ref. Co.*, 236 Mo. 407 [139 S. W. 545]; *McAuley* v. *Morris Plan Bank*, 155 Va. 777 [156 S. E. 418].) The checks involved in *First Nat. Bank* v. *Corcoran*, 105 Cal. App. 116 [286 Pac. 1105], were issued after the adoption of section 16c, but no mention is made in the case of such enactment. The relationship of principal and agent, urged as a defense in such case and as preventing the bank from becoming a holder in due course, arose out of the reserved right to receive the checks in question for the purpose of collection only and to charge them back to the depositor in case they were not paid. The amount of the deposit was paid out on the checks of the depositor, and in a suit by the bank against the maker thereof the trial court found that the bank held them for collection only, under the printed agreement on the deposit slips, and that it was not a holder in due course and for value. The appellate court reversed such decision, holding that the agreement gave the bank a right which it might exercise or not as it chose, and that having paid out the amount of the checks before it received any notice of defect in them, it was a holder in due course and for value and had a right to collect from the maker. See, also, *Anglo-California Trust Co.* v. *French American Bank*, 108 Cal. App. 354 [291 Pac. 621], where plaintiff bank under similar circumstances was also held to be a holder in due course, in a suit against an indorser.

We conclude that the section in question was adopted for the sole purpose of protecting the banks and making them safe for the many depositors whose money they use; that in adopting as law the effect of the agreements which the banks had adopted to protect themselves from becoming debtors in every case where they accepted checks as a general deposit the legislature did not intend to in any way restrict or limit the right of the banks to make advances to depositors on the strength of either the depositor's credit or that of the maker of the negotiable instrument deposited; that in this case when respondent bank accepted checks drawn on the amount of the deposited check without notice of any infirmity in it, the depositary became a holder thereof in due course and for value, with a right to recover from

the maker the amount called for by the instrument, and in our opinion the legislature intended in adopting such section to preserve to the banks all rights that attached to the same relationship created by agreement, as laid down in the decisions construing their rights thereunder.

Appellant urges in effect that the purpose of the legislature in enacting section 16c was to prevent overdrafts. We can see nothing in the amendment that can be so construed. Section 21b of the Bank Act, adopted in 1921, provides that: ''In no case shall an overdraft of more than ninety days' standing be allowed as an asset of any bank.'' There is nothing in section 16c that affects or seems to be intended to affect the question of overdrafts, and section 21b does not limit the banks' right to prevent overdrafts but simply requires the institution so permitting it to see that the same is paid within ninety days or to not thereafter consider it as an asset. Section 39 of the act prohibits any officer, director, agent, teller, clerk or employee of any bank from overdrawing his account, but that does not imply that the bank may not make a loan by way of overdraft to a customer, but fairly implies that it may be done. In the instant case we fail to see how, by giving section 16c the full effect claimed by appellant, an overdraft would be prevented. As a matter of fact, unless the respondent bank can collect on the check, on the faith of which it must in part at least have paid the checks of Sammis-McBrien Company, there is bound to be a loss to it.

It hardly seems that appellant, whose representatives saw the check-book of Sammis-McBrien Company and who knew that respondent bank was faced with an overdraft even with the credit of appellant's check, and who then failed to notify the bank that their company intended to stop payment on such check, is in a very good position to urge the defense here presented. One very large check was paid by respondent bank the day the condition of the bank account was known to appellant, and it may be that it would not then have been too late to charge all of the checks making the overdraft back to Sammis-McBrien Company, and thus have saved both the bank and appellant from loss if such notification had been timely made. Again, appellant issued a negotiable check, to circulate freely, when, as one of its employees testified, a bookkeeping entry was all

that was necessary. For this further reason it would seem that appellant should be held liable, on the well-known principle that where one of two innocent parties must suffer, the burden should be borne by the one whose action was the primary cause of the loss.

Judgment affirmed.

Craig, Acting P. J., and Stephens, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 1, 1933.