**EMELOID CO., Inc. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 10337.

United States Court of Appeals
Third Circuit.

Argued Feb. 6, 1951.

Decided May 10, 1951.

Sydney A. Gutkin, Newark, N. J. (David Beck, Newark, N. J., on the brief), for petitioner.

Carolyn R. Just, Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Helen Goodner, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

We are asked to decide whether sums borrowed by a corporation for the purchase of single-premium life insurance policies on the lives of its two principal stockholder-officers constitute "borrowed invested capital" within the meaning of Section 719 of the World War II Excess Profits Tax Act,[1] 26 U.S.C.A. § 719. The taxable year in question is the fiscal year ending June 30, 1944.

The basic facts are not in dispute; the only controversy is over the inferences or conclusions to be drawn therefrom. Petitioner is a New Jersey corporation engaged in the manufacture and sale of plastics. It is controlled by Myron P. Leeds and Edward K. Madan, who own in equal amounts all its outstanding common stock and who alternate each year as president and secretary-treasurer. Petitioner also has non-voting callable preferred stock outstanding, 89% of which is held by Leeds, Madan, and their wives, while 11% thereof is owned by outsiders.

Early in 1942, petitioner purchased eight[2] single-premium life insurance policies on the lives of Leeds and Madan. The face amount of these policies was $100,000 on

1. This act was repealed by the Act of Nov. 8, 1945, Ch. 453, Title I, § 122(a), which provided that the Excess Profits Tax Act shall not apply to any taxable year beginning after Dec. 31, 1945.

2. Four policies were procured on the life of Leeds and four on the life of Madan.

each life, or a total of $200,000, and petitioner was named as beneficiary on each policy. The total premium cost was $115,455, and was financed in the following manner: Some $18,000 was taken from the treasury of petitioner; the remainder, $97,500, was borrowed from the Central Hanover Bank and Trust Company of New York. This indebtedness was evidenced by two separate six year notes, each bearing interest at the rate of 2¼% per annum,[3] and the insurance policies were pledged to the bank as collateral for the loan.

In January 1946, a trust agreement was entered into by Leeds, Madan, their wives, and the petitioner with the National State Bank of Newark as trustee. This agreement was designed to anticipate the death of either Leeds or Madan. It provided, *inter alia,* that Leeds and Madan, together with their wives, would deposit all their shares of stock with the trustee. It was agreed that when the first of the two officers died, the trustee, on behalf of petitioner, would purchase, at a stipulated price, all the shares of stock owned by the decedent at his death plus all the stock owned by decedent's wife. Funds for such purchase were to be provided, at least in part, by the proceeds of the policies, which were forthwith assigned to the trustee. The purpose of the trust agreement, as stated therein, was to provide for continuity in the management and policies of the company.[4]

Petitioner computes its excess profits tax credit on the basis of invested capital. In arriving at its credit for the taxable year ending June 30, 1944, it included in its borrowed invested capital the $97,500 borrowed to finance the purchase of the single-premium life insurance policies. This was disallowed by the Commissioner, as a result of which a deficiency of $3,446.26 in petitioner's excess profits tax liability was determined. The Commissioner's determination was sustained by the Tax Court on the basis of Section 35.719–1 of Treasury Regulation 112, 26 Code Fed.Regs. § 35.719–1 (Cum. Supp.1943). While Section 719 of the Internal Revenue Code, 26 U.S.C.A. § 719[5] provides no definition of "borrowed invested capital" helpful to us, the above mentioned Treasury Regulation defines the term as follows: " * * * In order for any indebtedness to be included in borrowed capital it must be bona fide. It must be one incurred for business reasons and not merely to increase the excess profits credit." (Borrowed invested capital is defined in the statute as 50% of borrowed capital.)[6]

---

3. In 1946 this loan was renewed by petitioner at the same rate of interest, and a renewal note was issued to the bank in the amount of $97,500.

4. The scope of the trust agreement is revealed by the recitals, which state, *inter alia:*

"Whereas, the Stockholders and the Company desire to provide continuity in the management and policies of the Company, and, to that end, to arrange for the purchase by the Company, upon the death of either of the Insured Stockholders (the Insured Stockholder first to die being herein sometimes called the 'Decedent'), of all the shares of preferred and common stock of the Decedent and his wife, whether the wife be then living or dead, for the price and upon the terms and conditions hereinafter set forth, and

"Whereas, the Company has effected insurance on the lives of the respective Insured Stockholders, as set forth and described in Schedule 'A' annexed hereto and made part hereof, so that funds may be available for the payment of part or all of the purchase price of such shares, which policies, simultaneously with the execution hereof, have been deposited with the Trustee, except as stated in said Schedule 'A'; * * * *".

5. "Borrowed invested capital

"(a) Borrowed capital. The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

"(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, plus

* * * * * *

"(b) Borrowed invested capital. The borrowed invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be an amount equal to 50 per centum of the borrowed capital for such day." 26 U.S.C.A. § 719.

6. Ibid.

The Tax Court determined as its ultimate finding of fact that the insurance policies were purchased to further the personal interests of Leeds and Madan. In its opinion, the Tax Court said: "These provisions [of the trust agreement] make it abundantly evident that the true purpose of the insurance policies, and thus likewise of the indebtedness incurred to purchase them, was to provide available funds at the death of either Leeds or Madan so that the survivor would be readily enabled to purchase his deceased associate's interest. The benefit to the petitioner of such a transaction appears highly remote."

The principal arguments of petitioner on appeal are: (1) The indebtedness need not necessarily be incurred for a business purpose; Section 35.719–1 of Treasury Regulation 112 is invalid in that it provides a requirement for borrowed invested capital not contemplated by the Internal Revenue Code. (2) Assuming *arguendo* the validity of the regulation, the insurance was acquired to effectuate a legitimate business purpose.

The validity of Section 35.719–1 of Regulation 112 was recently considered by the Court of Appeals for the Eighth Circuit in Hart-Bartlett-Sturtevant G. Co. v. C. I. R., 1950, 182 F.2d 153.[7] In a well reasoned opinion, that court sustained the validity of the regulation. In this opinion, we shall assume, without deciding, that the regulation is a valid one.

The Hart-Bartlett-Sturtevant case, supra, is the only appellate case called to our attention which has applied the "business reason" test of Section 35.719–1. The taxpayer therein operated numerous grain elevators in midwestern states. During the war years, it borrowed large sums of money in order to purchase war bonds, which were pledged as security for the loans. The interest rates on the bonds were generally the same as those on the notes. The taxpayer allocated its purchases of war bonds for quota purposes to the various communities where its elevators were located. Several months after the Excess Profits Tax Act became ineffective, the taxpayer sold the bonds and retired the notes. The taxpayer contended that the bonds were purchased in the local communities in order to further the corporation's good will, and that this constituted a proper business purpose. The Court of Appeals for the Eighth Circuit, in affirming the decision of the Tax Court, held that the finding of the Tax Court that the sums in question were not borrowed for business reasons was supported by substantial evidence.

We believe that the conclusion reached by the Eighth Circuit in Hart-Bartlett-Sturtevant, supra, is a sound one. It is, however, distinguishable from the facts of the instant case. The fact that the bonds purchased by the taxpayer in that case were unloaded soon after the Excess Profits Tax was terminated suggests that the indebtedness was incurred principally to increase the taxpayer's excess profits tax credit. No such factor is present in the case at bar. We thus approach the resolution of our question without substantial aid from any appellate landmark.

The decision of the Tax Court in the instant case is based almost entirely on its interpretation of the trust agreement of 1946. Since this agreement was not in effect during the taxable year in question, we have substantial doubt as to its significance, or even its relevance. The insurance had been in effect for approximately four years before the trust agreement appeared on the corporate horizon. During that entire period, the corporation was the beneficiary of those policies. All the evidence clearly points to the conclusion that the insurance was purchased and maintained as key man insurance—as a means whereby petitioner could cushion the loss of one of its key men. Had either Leeds or Madan died during that period, the insurance proceeds would have flowed directly into the treasury of petitioner, and the petitioner could have

7. That part of the Treasury Regulation which petitioner attacks has been substantially incorporated into Section 439 of the Excess Profits Tax Act of 1950, Pub.L.No.909, 81st Cong., 2d Sess., Jan. 3, 1951, 26 U.S.C.A. § 439. Section 439 requires that the indebtedness must be "incurred in good faith for the purposes of the business".

applied the proceeds to whatever corporate purposes it deemed wisest. There is no evidence that during the four year period petitioner was in any way bound by contract, written or oral, to utilize the funds derived from the death of one of its key men for the purchase of stock from the decedent's estate.[8]

What corporate purpose could be considered more essential than key man insurance? The business that insures its buildings and machinery and automobiles from every possible hazard can hardly be expected to exercise less care in protecting itself against the loss of two of its most vital assets—managerial skill and experience. In fact, the government has not seriously contended here that key man insurance is not a proper corporate purpose.

We need not, however, rest this decision on the state of the record in the absence of the trust agreement, as it is not in the least inconsistent with the purpose originally underlying the purchase of the insurance. The trust was designed to implement that original purpose, and, at the same time, add a further business objective, viz., to provide for continuity of harmonious management. Harmony is the essential catalyst for achieving good management; and good management is the *sine qua non* of long-term business success. Petitioner, deeming its management sound and harmonious, conceived of the trust to insure its continuation. Petitioner apparently anticipated that, should one of its key stockholder-officers die, those beneficially interested in his estate might enter into active participation in corporate affairs and possibly introduce an element of friction.[9] Or his estate, not being bound by contract to sell the stock to petitioner, might sell it to adverse interests. The fragile bark of a small business can be wrecked on just such uncharted shoals.

Petitioner, in the situation provided for by the trust agreement, would also indirectly have the benefit of key man insurance.

8. The Tax Court, in its opinion, states that the trust arrangement was not indispensable to the insurance-stock purchase scheme. The reason advanced is that in the absence of the trust agreement, the survivor of Leeds or Madan, at the death of his associate, could cause the petitioner to apply the proceeds of the policies on the decedent's life to retire the stock owned by the decedent. There is no warrant in the record for this conclusion of the Tax Court, nor does the Tax Court indicate how the survivor, owning only 50% of the stock, could force the petitioner to utilize the proceeds of the insurance for the purchase of decedent's stockholdings. It is, of course, obvious that petitioner and the decedent's estate could, if both parties were agreeable, arrange such a purchase. But, in the absence of a contract between the parties, neither party would be bound so to do. The conclusion of the Tax Court thus tacitly assumes that the decedent's estate would be willing to sell its shares of stock in petitioner.

9. It may be noted that the Tax Court has hardly been consistent in its interpretation of the concept "business purpose." In defining dividends under Section 115 of the Internal Revenue Code, 26 U.S.C.A., the business purpose test has often been one of the factors weighed. See Commissioner of Internal Revenue v. Snite,

7 Cir., 1949, 177 F.2d 819. In Fred F. Fischer v. Commissioner, 6 T.C.M. 520 (1947), the Tax Court termed the promotion of harmony in the conduct of the business a proper business purpose. The taxpayer in that case was the majority stockholder of a corporation. The taxpayer's sister, a minority shareholder, had been constantly complaining about the conduct of the business. She had threatened to commence a legal action seeking a receivership for the corporation. In order to put an end to such dissension, the corporation purchased all the sister's stockholdings at a price in excess of its fair market value. The Commissioner contended that the stock purchase was prompted by reasons personal to the shareholders and was not in furtherance of any corporate purpose. The Commissioner assessed against all remaining shareholders of the corporation, in proportion to their holdings, a tax on that portion of the purchase price which was excessive, on the theory that it constituted a constructive dividend. The Tax Court found for the taxpayer, holding that the corporation's purchase of the sister's stock was in furtherance of a corporate business purpose. See also Bernard R. Armour, 1942 P-H BTA-TC Par. 42,447, 47 B.T.A. 1043; H. F. Asmussen v. C. I. R., 1937, 36 B.T.A. 878.

There would be no obligation on the corporation to retire the shares of stock purchased from the estate of the decedent. Borg v. International Silver Co., D.C.N.Y., 1926, 11 F.2d 143. Moreover, retirement of shares which results in a reduction of the capital of a corporation can be effected only by conformance with the statutory procedure. See N.J.S.A. 14:11–5. The shares purchased by petitioner would become treasury shares and could be resold in the same manner as other corporate assets. Borg v. International Silver Co., supra. The trust agreement provides petitioner with a method of subjecting all potential purchasers to a screening test, thus permitting the corporation to choose its new shareholders in a highly selective manner. Funds derived from the resale would then be available to the petitioner and provide it with needed working capital.

The interpretation placed on the trust agreement by the Tax Court was clearly erroneous. The corporate intent stated in the instrument is to provide for continuity in the management and policies of the company. The Tax Court made no finding that such was not a proper corporate purpose. It concluded that the real purpose of the insurance was to provide a means whereby the survivor, Leeds or Madan, could purchase the stockholdings of the decedent. That conclusion has no support in the record. The *petitioner,* not the *survivor,* is to purchase the stock of the decedent. The difference between a contract of purchase on the part of the corporation and one on behalf of the surviving stockholder is more than a highly technical distinction. Significantly different legal incidents flow therefrom. For example, the contract of the corporation to purchase its own shares is always subject to the condition imposed by law that such purchase will not result in the inability of the corporation to pay its creditors. Hoover Steel

Ball Co. v. Schafer Ball Bearings Co., 90 N.J.Eq. 164, 106 A. 471, Ct. Chancery, 1919. Moreover, as a matter of law, when the insurance proceeds are realized on the death of one or both insured, such funds, in the hands of the trustee, will be available, if needed, for the payment of creditors of petitioner. Thus, the insurance policies represent assets of petitioner which are subject, at all times, to the risks and hazards of the business.

We conclude that the indebtedness assumed by petitioner for the purchase of the single-premium life insurance policies was incurred for business reasons within the meaning of Section 35.719–1 of Treasury Regulation 112, and that the conclusion of the Tax Court is not supported by substantial evidence.[10] The judgment of the Tax Court will be reversed.

10. The petitioner has also urged upon us the contention that little, if any, weight should be given to the findings of fact of the court below, because the findings were made and the opinion written by a judge other than the one who heard the witnesses. The term of office of Judge Tyson, to whom the case was originally

assigned, ended on June 1, 1950, and the instant proceeding was reassigned to Judge Arundell of another division of the court. Since the judgment of the Tax Court will be reversed for the reasons set forth in this opinion, it is unnecessary to pass upon this point.