HUNT FOODS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20431.   Promulgated September 21, 1951.

366

*A. H. Deibert, Esq.*, and *William L. Kumler, Esq.*, for the petitioner.
*E. C. Crouter, Esq.*, for the respondent.

**OPINION.**

Rice, *Judge:* The first issue involves the reasonableness of amounts deducted by petitioner as compensation for personal services actually rendered by its president and vice president. Respondent determined that $3,712.94 of the $41,712.94 paid Lovegren is unreasonable, and that $5,312.94 of the $33,312.94 paid Eustis is unreasonable. Respondent contends that he has allowed as a deduction more than twice as much as Lovegren had ever received and nearly twice as much as Eustis had ever received. He contends further that the large increase in petitioner's volume of business was due to the war, and that the additional compensation had no relationship whatever to additional services rendered by Lovegren and Eustis, if any.

Respondent's contentions are not convincing. The facts show that 1942 was the biggest year in petitioner's history. While its net sales

exceeded its best previous year (1929) by about $300,000, its 1942 taxable. net income was approximately double the 1929 taxable net income of $371,397.93. This sales and earnings record of the petitioner was achieved largely through the constant efforts of Lovegren and Eustis. Each officer devoted his entire time to petitioner's business and the ability of each was well known in the canning industry.

The basic salaries voted Lovegren and Eustis of $18,000 and $15,000, respectively, represented a slight increase over their salaries for the fiscal year 1941. The increased compensation ultimately paid them was earned under the resolutions adopted by petitioner's board of directors on July 10, 1941, and January 15, 1942. The testimony details the consideration that moved the various directors and stockholders to vote additional compensation based upon percentage of profits realized. Actually the parties here are not too far apart in their determinations of what was reasonable compensation for the personal services rendered by the two principal officers. Since the question of reasonableness of the allowance is primarily factual, *Trust of Bingham* v. *Commissioner*, 325 U. S. 365, 370 (1945), it is our opinion, and we have so found, that the compensation paid petitioner's officers for the taxable year, was reasonable. On the first issue, therefore, we hold for petitioner.

Section 712 of the Internal Revenue Code provides for the allowance of an excess profits credit computed under either section 713 or section 714. The excess profits credit computed under section 714 is based upon the taxpayer's invested capital, which includes borrowed invested capital as provided for in section 719. The pertinent portions of section 719 appear in the margin.[1]

We are not concerned here with the amounts of petitioner's borrowed invested capital under section 719, as the amounts involved have been stipulated. Our question is whether the stipulated amounts qualify as borrowed invested capital under the statute. Application of the statute to the facts requires a determination of two principal questions: first, whether the stipulated amounts constitute an outstanding indebtedness of the taxpayer for the fiscal years 1941 and 1942; and second, whether the outstanding indebtedness was evidenced, in this instance, by a bill of exchange. If both questions are answered affirmatively, the stipulated amounts are to be included in

---

[1] SEC. 719. BORROWED INVESTED CAPITAL.

(a) BORROWED CAPITAL.—The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

    (1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, plus,

    \*        \*        \*        \*        \*

(b) BORROWED INVESTED CAPITAL.—The borrowed invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be an amount equal to 50 per centum of the borrowed capital for such day.

petitioner's invested capital for each year in determining its excess profits credit. If either question is answered in the negative, respondent properly excluded the stipulated amounts from *petitioner's* borrowed invested capital.

On the first question petitioner contends that it borrowed money from the bank, deposited sight drafts drawn on its customers for goods sold as security therefor, and authorized the bank to collect and apply the proceeds of the draft in satisfaction of the loan thereon. Petitioner contends that such arrangements are common in the food packing industries. Respondent contends that the bank purchased the drafts and loaned petitioner no money thereon. Petitioner replies that the bank was not a purchaser of the drafts but was petitioner's agent for the collection thereof.

The use of drafts with bills of lading attached is a recognized medium of carrying on commerce, particularly in marketing the immense crops of the South and West.[2] The handling of commercial paper by banks is a part of their banking business, and it is a normal and usual business practice for a firm marketing its products in various parts of the country to deposit its commercial paper with its local bank. When a business firm deposits commercial paper with its bank one of the important questions which arises is the precise relationship which results from the deposit of the paper. Does the bank become the owner of the paper, or does the depositor remain the owner and the bank act as agent for collection? Obviously, the legal rights and the liabilities of an owner of negotiable paper are different from those of an agent for the owner of such paper. *Exchange National Bank* v. *Third National Bank*, 112 U. S. 276, 291 (1884).

No question of ownership of commercial paper will arise ordinarily where the relationship between the bank and its depositor is defined by written contract. It is the absence of such written agreements in the handling and negotiation of commercial paper that has been so productive of litigation. In the *Exchange National Bank* case, *supra*, the Supreme Court approved the so-called "New York rule" regarding the liability of a bank taking paper for collection from a depositor in the usual course of business. In the course of its opinion the Court stated, page 289:

\* \* \* And, while the rule of law is thus general, the liability of the bank may be varied by consent, or the bank may refuse to undertake the collection. It may agree to receive the paper only for transmission to its correspondent, and thus make a different contract, and become responsible only for good faith and due discretion in the choice of an agent. If this is not done, or there is no implied understanding to that effect, the same responsibility is assumed in the undertaking to collect foreign paper and in that to collect paper payable at home. On any other rule, no principal contractor would be liable for the default

---

[2] 8 Zollmann's Bank and Banking, 273, section 5497.

of his own agent, where from the nature of the business, it was evident he must employ sub-agents. * * *

In *Burton* v. *United States*, 196 U. S. 283 (1904), the Supreme Court pointed out at pages 297 and 303 that there was no oral or special agreement between the depositor and the bank when checks were deposited and credit given for the amount thereof, and it was held that the bank became the owner of the check and was in no sense the agent of the depositor.

In *Federal Reserve Bank* v. *Malloy*, 264 U. S. 160 (1924) the Court, after commenting on the conflicting New York and Massachusetts rules with respect to the liability of a correspondent bank to the owner of a check forwarded for collection by the initial bank of deposit, again pointed out that the applicable rule of law can be varied by contract, express or implied, in the following words, p. 164:

* * * This Court in *Exchange National Bank* v. *Third National Bank*, 112 U. S. 276, after reviewing the two lines of decisions, approved the "New York rule." But the rule may, of course, be varied by contract, express or implied. Id. 289. * * *

In *City of Douglas* v. *Federal Reserve Bank*, 271 U. S. 489 (1926), the Supreme Court ruled as follows with respect to commercial paper, p. 492:

* * * when paper is indorsed without restriction by a depositor, and is at once passed to his credit by the bank to which he delivers it, he becomes the creditor of the bank; the bank becomes owner of the paper, and in making the collection is not agent for the depositor.

On page 493 the Supreme Court said further:

While there is not entire uniformity of opinion, the weight of authority supports the view that upon the deposit of paper unrestrictedly indorsed, and credit of the amount to the depositor's account, the bank becomes owner of the paper, notwithstanding a custom or agreement to charge the paper back to the depositor in the event of dishonor. * * *

The Supreme Court's opinion in the *City of Douglas* case was based upon findings made by the Federal District Court for the Western District of Texas in *City of Douglas, Ariz.* v. *Federal Reserve Bank of Dallas*, 300 F. 573 (1924), which read in part as follows, p. 574:

* * * There was no other contract or agreement made between the City of Douglas and the said First National Bank of Douglas than such as arose impliedly from the acceptance by said bank of said check for collection, and there was no statute of the state of Arizona upon the subject which entered into or changed or modified said contract in any respect.

In an annotation appearing in 68 A. L. R. 725, at page 731, the *City of Douglas* case, and other numerous Federal and state cases, are cited as authorities for the proposition that where there is no definite understanding between the bank and its depositor as to the ownership of deposited commercial paper, but such paper is indorsed by an un-

restricted indorsement and deposited in the usual course of business with the bank, which gives credit to the depositor for the amount thereof with the right to draw thereon, title to the paper so deposited passes to the bank. Under this rule, the bank collects commercial paper as the owner thereof. In view of the factual basis of the *City of Douglas* case, and in view of the qualifications appearing in the other Supreme Court decisions, if it can be said that there was an agreement or understanding between petitioner and its bank which waived the rule and provided that the bank should act as agent for its depositor, the petitioner, then the rule announced in the *City of Douglas* case would not apply, and we would recognize the agreement or understanding of the parties.

We have affirmative statements in the record from officials of the bank that the bank had no written contract with petitioner defining their relationship or legal rights with respect to the deposited sight drafts. In the absence of a written agreement, the intention of the parties with respect to their sight draft transactions may be ascertained from a consideration of their course of conduct or the ordinary course of their business dealings as disclosed by the evidence. *Holloway* v. *Dykes*, 29 F. 2d 430 (N. D. Okla., 1928) ; *Fayette National Bank* v. *Summers*, 54 S. E. 862, 7 L. R. A. (N. S.) 694 (1906), and cases cited in note thereto.

Petitioner also points out that under the California Bank Act,[3] enacted in 1925, the bank acted as petitioner's agent in collecting the sight drafts and did not acquire ownership of the drafts, or deal with them after deposit as if it were the owner. Section 16 (c) of said Bank Act provides a collection procedure for banks on deposited commercial paper and limits the bank's liability thereon until the proceeds of the commercial paper are actually received in money or solvent credit. The pertinent portions of section 16 (c) are set forth in the margin.[4]

---

[3] Stats. 1925, p. 513, sec. 5 ; vol. 1, Deering's Gen'l Laws, 1931, p. 232, Act 652.

[4] Sec. 16 (c) Checks, etc., deposited for collection. Any credit allowed by any bank organized under the laws of, or doing business in, this state, for any check, note or other instrument providing for the payment of money and drawn on or payable at the same bank in which it is deposited, or on or at any other bank, or on any other branch of the same bank, or on any other party, shall be only provisional, subject to final payment and to the receipt by the bank in which it is deposited of the funds in actual money, or in solvent credit on the books of any federal reserve bank, or on the books of any bank designated as a depositary by the forwarding bank ; * * * and further provided, that when such check, note or other instrument providing for the payment of money is drawn on or payable at any other bank, or on any other party, it shall be sent in course of collection by the end of the next succeeding business day and may be forwarded for the purpose of collection directly to the bank on or by which it is drawn, or at which it is made payable, or to any federal reserve bank, or to any other bank in the usual course of business ; and in payment thereof there may be accepted either money or the check or draft of the bank on or by which it is drawn, or at which it is made payable, or the check or draft of any bank to or through which it has been forwarded for collection, or credit therefor may be accepted with any federal reserve bank, or with any bank designated as a depositary by the forwarding bank.

In forwarding for collection any check, note or other instrument, or receiving payment therefor, in any manner aforesaid, the bank shall not be liable in the event of the insolvency

Petitioner contends that the deposited sight drafts were handled by the bank as collection items in accordance with the provisions of section 16 (c) of the California Bank Act and that the understanding with the bank so to treat the sight drafts is abundantly established by the business dealings and the course of conduct between petitioner and its bank during and prior to the taxable years.

It is established and we have found that petitioner sought and obtained lines of credit from the bank in order to transact its business operations. It was necessary for petitioner to obtain this credit in order to operate its business of packing and marketing the vegetables and fruits which it sold in many parts of the United States. The bank's loan committee in extending the credit undoubtedly weighed the magnitude of petitioner's operations, its financial resources, and the security available for the requested loans. Our findings show that the lines of credit extended to petitioner in 1941 and 1942 aggregated $3,600,000 and $3,900,000, respectively, of which $550,000 and $750,000, respectively, were for secured and unsecured sight draft loans. It was pursuant to the line of credit obtained on the sight drafts that petitioner deposited the drafts with the bank and was advanced or loaned the full face amount thereof. It was understood by both parties to the deposit transactions that the bank would be repaid out of the proceeds collected on the sight draft. The treatment of the deposited drafts, the loans thereon, and repayment out of collection on the books and records of both parties is consistent with their understanding that title did not pass to the bank.

Furthermore, in the few instances where drafts were dishonored, it was the petitioner that was considered by the parties to be the owner of the merchandise, and it was petitioner's responsibility to find another purchaser therefor. The sight drafts were payable to petitioner, as "Ourselves," and were not made payable to the bank. Interest was paid the bank on the full amount of the sight draft for the number of days it was outstanding which is a circumstance tend-

---

or other default or for any act or omission, of any other bank employed directly or indirectly in handling the collection of such check, note or other instrument, or of any bank on or by which the draft received in payment is drawn; nor for the payment of any check, or draft, or credit as may have been accepted in payment therefor; nor for the loss or destruction of, or inability to repossess itself of any check, note or other instrument in transit or in the possession of others. Until the proceeds of any check, note or other instrument providing for the payment of money shall have been actually received by the bank allowing such credit, in actual money, or in solvent credit on the books of any federal reserve bank, or on the books of any bank designated as a depositary by the forwarding bank, such check, note or other instrument may be charged back to, or collected from, the depositor from whom it was received regardless of whether or not the check, note or other instrument itself can be returned. * * *

*Any provision of this section may be modified or set aside by an agreement* in writing between any such bank and any party from whom any check, note or other instrument is received for collection, deposit, or other purposes. [Italics appear in General Laws of California.]

ing to show that the bank was an agent and not the owner of the draft. *Mayfield* v. *First National Bank*, 287 S. W. 510 (1926). We note too that the only discount involved in dealing with these sight drafts was the discount petitioner allowed its customers; there is no suggestion or intimation that petitioner was discounting sight drafts at its bank. These factors and circumstances are matters of record which indicate the understanding and agreement of the parties that title to the deposited paper should not pass to the bank.

In addition thereto, the California Bank Act establishes by state law the relationship which exists between a bank and a depositor of commercial paper. The legislative history of the California statute is set forth in *Bank of America* v. *Universal Finance Co.*, 21 P. 2d 147 (1933). One of its purposes was to relieve the bank from certain liabilities in making collections on deposited commercial paper. In speaking of a similar statute enacted by the State of Florida, the Supreme Court of the United States held, in *Dakin* v. *Bayly*, 290 U. S. 143, 147 (1933), that the parties are presumed to have contracted with reference to the state statute, and the situation is as if they had expressly agreed that the initial "bank was to act as agent only and was not to become the debtor of the depositors unless and until it had received actual and final payment of the checks." To the same effect is *Federal Reserve Bank* v. *Malloy*, 264 U. S. 160 (1924) ; *Miami* v. *First National Bank* (C. A. 5, 1932), 58 F. 2d 561, 564; and *Schram* v. *Askegaard* (D. Minn. 1929), 34 F. 2d 348.

Upon this record, the cited authorities, and the California statute we are convinced that the bank acted as petitioner's agent in collecting the sight drafts. The course of dealing between the parties, their treatment of the transactions on their respective books of account, the need of the petitioner for bank loans to conduct its business operations, and the security obtained by the bank for its loans, persuade us that petitioner's obligation to repay each loan secured by a sight draft was fixed and certain. Petitioner borrowed regularly from the bank on its sight drafts and the amount thereof constituted an outstanding indebtedness, within the meaning of section 719.

In reaching this conclusion we are not unmindful of our decision in *Fraser-Smith Co.*, 14 T. C. 892 (1950). In that case we followed the *City of Douglas* rule, *supra*, which, as hereinbefore pointed out, governs where there is no agreement or understanding between the bank and its depositor as to the ownership of the deposited paper. Here we have an understanding between the parties and full compliance by both in carrying out that understanding. The *City of Douglas* rule, and the *Fraser-Smith* case, are inapplicable, and the doctrine there set forth should not be extended to situations such as exist here. This is particularly true in view of the Supreme Court's

pronouncements in the *Dakin* v. *Bayly* and *Malloy* cases, *supra*, that the parties are presumed to contract with reference to the state statute.

The second question is whether the amount of the outstanding indebtedness was evidenced by a bill of exchange, one of the forms of indebtedness enumerated in the statute. The parties agree that a sight draft is a bill of exchange as defined in section 3207, Civil Code of California, Deering's 1941 Edition, and that it qualifies as a bill of exchange under section 719 (a) (1) of the Internal Revenue Code. Petitioner relies upon our decision in *William A. Higgins & Co.*, 4 T. C. 1033 (1945). That case involved four different types of claimed borrowed capital, two of which were conceded by the Commissioner and two of which were disputed. The two disputed types were (1) outstanding letters of credit by banks issued pursuant to the taxpayer's application therefor, and (2) drafts accepted by the banks under the letters of credit. We held that the letters of credit did not evidence outstanding indebtedness of the taxpayer, but that the drafts accepted for the taxpayer's account did evidence an outstanding indebtedness. Petitioner stresses that portion of our opinion which reads as follows:

In order to satisfy the statute it is not enough for the indebtedness to be the "outstanding indebtedness * * * of the taxpayer." It must also be "evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust." The respondent concedes that the acceptances here in question qualify as bills of exchange, but he argues that they were the banks' bills of exchange and not petitioner's, and that this fact is fatal to petitioner's claim for a borrowed invested capital as far as these acceptances are concerned. We do not think that this conclusion follows. The statute requires that the indebtedness has to be the indebtedness "of the taxpayer," but it does nòt require that the specific type of instrument mentioned in the statute be that "of the taxpayer." All that the statute requires is that the outstanding indebtedness of the taxpayer be "evidenced by" one of the specific types of instruments.

We think it is clear that it was acceptance of the draft that created the indebtedness against the drawee-purchaser in the *Higgins* case, *supra*, but here we have no acceptance, for the paper was sight drafts which were paid at the time they were accepted. Petitioner in the ordinary course of its business borrowed against its sales contracts in order to finance its business operations. It had sold merchandise to its customers, just as the merchants in Brazil and India had sold merchandise to the taxpayer in the *Higgins* case, and like the foreign sellers in the cited case petitioner drew drafts against its purchasers for the amount of the merchandise sold. The question then is whether petitioner's borrowing against sales was evidenced by the sight drafts with attached bills-of-lading as security for the loans.

Only a few of the decided cases on borrowed invested capital have turned on the type or form of the instrument which evidenced the in-

debtedness. In *Economy Savings & Loan Co.*, 5 T. C. 543 (1945),[5] and *Ames Trust & Savings Bank*, 12 T. C. 770 (1949), we held that certificates of deposit evidenced the outstanding indebtedness and constituted borrowed invested capital, within the meaning of section 719. The *Ames* case was reversed on appeal by the Court of Appeals for the Eighth Circuit, *Commissioner* v. *Ames Trust & Savings Bank*, 185 F. 2d 47 (1950), followed in *National Bank of Commerce*, 16 T. C. 769. In *Brewster Shirt Corporation* v. *Commissioner* (C. A. 2, 1947), 159 F. 2d 227, the Court of Appeals, in reversing a Memorandum Opinion of this Court, held that advances, made pursuant to a factoring arrangement and the assignment of accounts receivable as security therefor, constituted a "mortgage" of the accounts to secure the taxpayer's indebtedness within the meaning of section 719. *Central Station Signals, Inc.*, 10 T. C. 1015 (1948), affd. per curiam (C. A. 2, 1949) 174 F. 2d 479, is to the same effect; but see, *Consolidated Goldacres Co.* v. *Commissioner* (C. A. 10, 1947), 165 F. 2d 542, affirming 8 T. C. 87, which involved a conditional sales contract, and *Bernard Realty Co.* v. *United States* (C. A. 7, 1951), 188 F. 2d 861, reversing 92 F. Supp. 805 (1950), which involved a Wisconsin land contract.

Cases involving the business purpose[6] of the borrowed invested capital are of little assistance for the reason that the sums here were borrowed for a definite business purpose. In our research and examination we have found no Court of Appeals case so similar factually as to be controlling here. We look, therefore, to the particular facts of this case weighing the course of dealing of the parties with common usage and custom in the conduct of business generally. Petitioner's method of financing its business operations is a recognized and accepted business practice in the South and West. We have held that petitioner borrowed the amounts in question from its banks and that such amounts represented an outstanding indebtedness of the petitioner. The record shows that the only instruments specified by the statute that could evidence this outstanding indebtedness were the sight drafts or bills of exchange. Can it be said that such bills of exchange *evidenced* loans to petitioner?

The *Higgins* case, *supra*, is authority for the rule that the indebtedness has to be the indebtedness "of the taxpayer" but that the statute does not require the bills of exchange to be those "of the taxpayer." It therefore follows that, irrespective as to whether or not the bills of exchange were those "of the taxpayer," we are of the opinion and hold, upon the authority of the *Higgins* case, that the bills of exchange

---

[5] On review by the Court of Appeals for the Sixth Circuit, the point for which this case is cited was not considered.

[6] *Mahoney Motor Co.*, 15 T. C. 118 (1950), and cases there cited and discussed; *Emeloid Co.* v. *Commissioner* (C. A. 3, 1951), 189 F. 2d 230, reversing 14 T. C. 1295.

drawn by petitioner on its customers and used under its letters of credit to secure loans from its banks evidenced the outstanding indebtedness to the banks for the sums borrowed, and accordingly the stipulated amounts should be included in petitioner's borrowed invested capital for excess profits tax purposes.

Reviewed by the Court.

*Decision will be entered under Rule 50.*